## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 91-CA-00172-SCT

*GULF COAST RESEARCH LABORATORY, HAROLD
D. HOWSE AND DAVID COOK*

*v.*

*KUMAR AMARANENI, ADMINISTRATOR OF THE
ESTATE OF AMARANENI VENKATARAMIAH, AND
G.J. LAKSHMI*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/16/91 |
| TRIAL JUDGE: | HON. KENNETH BARKLEY ROBERTSON |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | OFFICE OF THE ATTORNEY GENERAL BY: ROBERT G. JENKINS |
| | LEE PARTEE GORE |
| ATTORNEY FOR APPELLEES: | EARL L. DENHAM |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND REMANDED - 10/8/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 10/29/98 |

### EN BANC.

### PER CURIAM:

¶1. A majority of the court agrees that the judgment of the trial court must be reversed but fails to agree on the disposition thereafter. Because we cannot agree on any instructions to guide the lower court, we remand the case to be decided on such principles as the trial judge may deem right. *See McNutt v. Lancaster*, 17 Miss. 570 (1848).

### BANKS, JUSTICE, DELIVERS THE FOLLOWING OPINION:

¶2. This matter is before the Court on various state and federal claims, most notably a claim by the plaintiffs under 42 U.S.C. § 1983 that their civil rights were violated on account of their race and national origin. We conclude that the State is not a "person" under the federal statute pursuant to the United States Supreme Court's holding in *Will v. Michigan Department of State Police,* and should have been dismissed from this suit as to that claim. We also conclude that the plaintiffs' procedural

due process rights were not violated. The plaintiffs presented a viable claim against the individuals under 42 U.S.C. § 1983. The chancellor, however, applied an erroneous standard under federal law in finding discriminatory intent on the part of the individual defendants and misapplied the law concerning damages. Thus, we reverse and remand for further proceedings.[(1)]

## I.

¶3. The Board of Trustees of State Institutions of Higher Learning (IHL) has authority over the Gulf Coast Research Laboratory (GCRL) pursuant to Miss. Code Ann. § 37-101-21 (1996). Dr. G. J. Lakshmi was hired in 1970 and Dr. A. Venkataramiah (also referred to as Dr. Ramiah) was hired in 1969 as scientists at GCRL. They were hired to create the Physiology Section of GCRL and conduct research on shrimp. Both were hired by Dr. Gordon Gunter, Director of GCRL. They testified that they were led to believe that they would have continuing employment. Dr. Gunter indicated that he thought their employment was permanent, although there no written contract of employment. Drs. Ramiah and Lakshmi relied on Dr. Gunter's assurance as Director of GCRL in 1969 and 1970 when they were hired that their employment was continuous. In addition, Dr. Ramiah presented documentation from Dr. Howse indicating that Dr. Ramiah was a "permanent" employee of GCRL. Testimony was offered that indicated that Plaintiffs experienced a hostile work environment.

¶4. In 1985, Dr. Howse, the new GCRL Director, learned of budget problems that the State of Mississippi was experiencing that might result in reduced appropriations to GCRL. In May of 1986, after receiving a reduced financial appropriation from the state legislature as expected, Howse requested, and the Board of Trustees for IHL approved, a reduction in force plan. At the time the reduction in force was declared, GCRL had approximately 130 employees, 9 of whom were minorities. Ramiah and Lakshmi were the only minorities on the senior staff. Under the plan 34 people were terminated, 8 of whom were minorities and 26 non-minorities. On May 16, 1986, Drs. Ramiah and Lakshmi received letters from Dr. Howse terminating their employment with GCRL pursuant to the reduction in force plan. Shortly thereafter they submitted written objections to their terminations and requested that a hearing be provided to appeal their terminations. On June 30, 1986, the Workforce Reduction Appeal Panel submitted a final report finding that the plaintiffs' terminations were fair and reasonable.

¶5. Both Ramiah and Lakshmi were offered opportunities for reemployment with GCRL on November 21, 1986. These offers were to assume their previous jobs for a period through June 30, 1987. However, they refused the offers in a letter drafted by legal counsel representing both parties in this matter.

¶6. On May 18, 1987, Ramiah and Lakshmi filed a seven-count complaint in the Chancery Court of Jackson County, Mississippi. Count I charged that Defendants Howse and Cook in their individual capacities conspired to and did induce GCRL to unlawfully discharge the plaintiffs because of their race and national origin. Count II charged that the individual defendants unjustifiably interfered with their contracts of employment with GCRL because of the plaintiffs' race and national origin. Count III charged that the individual defendants interfered with the plaintiffs' prospective economic advantages because of their race and national origin and because the plaintiffs refused to compromise ethical and scientific standards. Count IV charged that GCRL unlawfully breached the plaintiffs' respective contracts of employment as a result of GCRL's policies and practices of discrimination

based on race and national origin and because the plaintiffs refused to compromise ethical and scientific standards. Count V charged that the defendants, by their actions, tortiously violated the plaintiffs' constitutional rights by depriving them of due process, equal rights and privileges under the law, and freedom of speech because of the plaintiffs' race and national origin and because they refused to compromise ethical and scientific standards. Count VI charged the defendants with libel per se and per quod. Count VII charged the defendants with a violation of Miss. Code Ann. § 95-1-1, the "actionable words" or "anti-dueling" statute. Ramiah and Lakshmi sought injunctive and declaratory relief as well as compensatory and punitive damages.

¶7. On June 17, 1987, the Attorney General for the State of Mississippi filed a motion to dismiss the complaint. On March 22, 1988, the State's motion to dismiss was denied and the appellants/defendants filed an answer to the complaint on March 30, 1988. Thereafter, trial was commenced in the Chancery Court of Jackson County, Judge Kenneth B. Robertson presiding. The chancellor issued an Opinion of the Court on July 3, 1990, in which injunctive relief for reinstatement was denied. The lower court also issued a Supplemental Opinion Number 1 on October 11, 1990; a Corrected Supplemental Opinion on October 15, 1990; a Supplemental Opinion Number 2 on October 16, 1990; a Supplemental Opinion Number 3 on October 18, 1990; and a Supplemental Opinion Number 4 on October 20, 1990. In spite of the numerous claims listed in the complaint, the findings and conclusions of the court focused almost exclusively on the plaintiffs' civil rights claim against GCRL and the individual defendants under 42 U.S.C. § 1983. A final judgment was entered in favor of the appellees on January 16, 1991, granting Dr. Ramiah $210,000 and Dr. Lakshmi $180,000 in damages. Also, the plaintiffs were granted $71,000 in legal fees, apparently by authority of 42 U.S.C. § 1988(b), which allows for attorneys' fees where a violation of § 1983 is proved. On February 14, 1991, Defendants filed an appeal to this Court.

II.

¶8. Our standard of review in this appeal is well settled. This Court will not disturb a chancellor's findings "'unless the chancellor was manifestly wrong, clearly erroneous, or applied an erroneous legal standard.'" *Merchants & Planters Bank of Raymond v. Williamson,* 691 So. 2d 398, 402 (Miss. 1997) (*quoting **Tinnin v. First United Bank of Mississippi***, 570 So. 2d 1193, 1194 (Miss. 1990)); *United S. Bank v. Bank of Mantee,* 680 So. 2d 220, 222 (Miss. 1996).

III.

¶9. While multiple charges were listed in the complaint filed by Ramiah and Lakshmi, the findings and conclusions of the court below focused on the liability of GCRL and the individual defendants under 42 U.S.C. § 1983. The appellants/defendants argue that the trial court erred in finding liability under the federal statute because several defenses are applicable to insulate GCRL, and Dr. Howse and Dr. Cook in their official capacities, from liability. They claim that these defendants do not come within the definition of "persons" as defined by 42 U.S.C. § 1983. Next, they claim that the decision which led to the termination of the appellees was an exercise of discretionary authority by a state employee which is protected under the doctrine of sovereign immunity. Finally, the appellants argue that Dr. Howse and Dr. Cook are entitled to qualified immunity because each was operating within the parameters of objective reasonableness and under the mandates of the Board of Trustees which has authority over GCRL. The appellants contend that the foregoing defenses preclude any finding of

liability, and that the trial court was manifestly in error when it failed to dismiss the case.

## 1. The State as Defendant under 42 U.S.C. § 1983

¶10. The appellants' first contention is that the lower court should have dismissed GCRL, as well as Dr. Howse and Dr. Cook in their official capacities, at the outset of the litigation. They claim that states and state agencies are not "persons" for purposes of 42 U.S.C. § 1983. Section 1983 reads as follows:

> Civil action for deprivation of rights. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983 (1994).

¶11. The Institutions of Higher Learning have consistently been held to be agents of the State. *See Jagnandan v. Mississippi State Univ.,* 373 So. 2d 252, 253 (Miss. 1979), *overruled on other grounds by Pruett v. City of Rosedale,* 421 So. 2d 1046 (Miss. 1982); *Bruner v. University of S. Mississippi,* 501 So. 2d 1113, 1115 (Miss. 1987); *Sorey v. Kellett,* 849 F.2d 960 (5th Cir. 1988). Moreover, under *Will v. Michigan Department of State Police,* 491 U.S. 58 (1989), the United States Supreme Court ruled that states and state agencies are not within the class of potential defendants under § 1983: "[w]e hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will,* 491 U.S. at 71. *Will* was decided before final judgment was rendered in the court below, and a proper Motion to Dismiss for failure to state a claim had been filed by the Attorney General on June 17, 1987. Thus GCRL, as well as Dr. Howse and Dr. Cook in their official capacities, should have been dismissed as parties to the § 1983 claim.

¶12. Ramiah and Lakshmi incorrectly assert that *Will* was overruled by *Hafer v. Melo,* 502 U.S. 21 (1991). *Will* stands for the proposition that state officials acting in their official capacity are not statutory "persons" under § 1983. In *Hafer,* the Court took up the separate definitional issue of whether state officials, in their *individual* capacities, are such statutory "persons." The petitioner in *Hafer* sought a broad reading of the restriction imposed by *Will,* arguing that § 1983 does not authorize suits against state officers for damages arising from official acts. *See Hafer,* 502 U.S. at 23. However, the phrase, "acting in their official capacities" refers not to the capacity in which the officer inflicts the injury, but in the capacity in which the officer is sued. *Id*. at 26-27. To hold otherwise, the Court observed, would erase the distinction between official and personal capacity suits. Simply stated, individual defendants in § 1983 suits are not automatically shielded from personal liability under § 1983 "solely by virtue of the 'official' nature of their acts." *Id.* at 31.

¶13. Thus, *Hafer* does not disturb the holding in *Will,* which dictates that GCRL, and Dr. Howse and Cook in their official capacities, should have been dismissed in a suit for damages under § 1983. *Hafer* stands only for the proposition that Dr. Howse and Dr. Cook, in their individual capacities, are

"persons" under § 1983, and could properly be sued under the federal statute. Since the mandate of *Will* is clear, GCRL's defense of sovereign immunity need not be addressed.

**2. Qualified Immunity for Individual Defendants Howse and Cook**

¶14. Dr. Howse and Dr. Cook claim they are entitled as individuals to the defense of qualified immunity, under both federal and state law standards. While it is a close question, we agree with the appellants on the threshold issue of whether Howse and Cook were performing discretionary duties when they implemented the reduction in force plan. "An official acts within his discretionary authority when he performs nonministerial acts within the boundaries of his official capacity." *Tamez v. City of San Marcos,* 118 F.3d 1085, 1091-92 (5th Cir. 1997). As head of GCRL, Howse decided whether to request the declaration of financial exigency. And while GCRL was required to get final approval from IHL for actions taken under the reduction in force plan, it was Howse and Cook who designed the criteria for implementing the plan. Their actions here were not pursuant to specific orders, or spelled out in minute detail beforehand. *See id.* Thus, some degree of deliberation or judgment characterized the actions of the defendants and as such these actions are discretionary.

¶15. Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken. The Fifth Circuit has recently outlined this standard as it relates to the employment context:

> To determine whether qualified immunity applies, a court must first determine whether the plaintiff has asserted a violation of a constitutional right. *Siegert v. Gilley,* 500 U.S. 226, 231, 111 S. Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). This determination is made using currently applicable constitutional standards. *Nerren v. Livingston Police Department,* 86 F.3d at 473. If so, the court must then decide if the defendant's conduct was objectively reasonable, using the standards applicable at the time the events occurred. *Id*; *Johnston v. City of Houston,* 14 F.3d at 1059. If, upon viewing the evidence in the light most favorable to the nonmovant, reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S. Ct. 3034, 3038, 97 L.Ed.2d 523 (1987), citing *Pfannstiel v. City of Marion,* 918 F.2d 1178, 1183 (5th Cir. 1990).

*Southard v. Texas Bd. of Criminal Justice,* 114 F.3d 539, 550 (5th Cir. 1997). Stated in simple terms, officials performing discretionary functions are shielded from civil damages liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson,* 483 U.S. at 638.

¶16. Qualified immunity will not protect officials who knowingly violate the law. *See Malley v. Briggs,* 475 U.S. 335 (1986). As we will discuss, this Court is remanding for more specific findings and conclusions on the issue of whether Howse and Cook intentionally discriminated against Ramiah and Lakshmi. The issue of qualified immunity is dependent upon this determination, since it can fairly be said that intentional discrimination on the basis of race or ethnic heritage would constitute objectively unreasonable grounds on which to terminate the plaintiffs.

¶17. The issue of qualified immunity for the various state law claims against Howse and Cook as

individuals is resolved similarly. Discretionary duties are those positively imposed by law but which are dependent upon an officer's judgment or discretion. *See* **Bankston v. Pass Rd. Tire Ctr., Inc.,** 611 So. 2d 998, 1008-09 (Miss. 1992). Common law qualified immunity has traditionally sought to protect the discretion of public officials so that those officials would not be deterred by the threat of suit from making decisions and formulating policies that are in the public good. **State of Mississippi ex rel. Brazeale v. Lewis,** 498 So. 2d 321, 322 (Miss. 1986); **T. M. v. Noblitt ,** 650 So. 2d 1340, 1343 (Miss. 1995). However, qualified immunity does not protect those who engage in egregious behavior:

> Our law thus directs that a governmental official has no immunity to a civil action for damages if his breach of a legal duty causes injury and (1) that duty is ministerial in nature, or (2) that duty involves the use of discretion and the governmental actor greatly or substantially exceeds his authority and in the course thereof causes harm, or (3) the governmental actor commits an intentional tort.

**Grantham v. Mississippi Dept. of Corrections**, 522 So. 2d 219, 225 (Miss. 1988). Ramiah and Lakshmi claimed that the appellants exercised excessive authority and in effect committed an intentional tort. If this is found by the chancellor to be true, then qualified immunity for the state law claims does not apply.

IV.

¶18. Uniform Chancery Court Rule 4.01 and Miss.R.Civ.P. 52 authorize the trial court to make specific findings of fact and state separately its conclusions of law thereon. While Miss.R.Civ.P. 52 "gives the court discretion to make such findings absent a party's request, it further provides, as does Uniform Chancery Court Rule 4.01, that a chancellor 'shall' make such findings when required or requested by a party to the suit." **Century 21 Deep S. Properties, Ltd. v. Corson,** 612 So. 2d 359, 366 (Miss. 1992). One of the principal rationales for this rule is to provide the appellate court with guidance as to what the trial court actually did, that is, what facts it found and what law it applied. Jeffrey Jackson, Mississippi Civil Procedure § 13:5 (1997). With this in mind, this Court has held that in complex cases tried upon the facts without a jury, Miss.R.Civ.P. 52 should be construed to read that the lower court "generally should" find facts specially and separately state its conclusions of law thereon even absent a request by a party. **Tricon Metals & Services, Inc. v. Topp,** 516 So. 2d 236, 239 (Miss. 1987).

¶19. Ordinarily, Rule 52 is invoked where the trial court has failed to make specific findings of fact after a request by one of the parties. In **Tricon Metals,** for example, theChancery Court made no findings of fact or conclusions of law. This Court stated that it was "virtually precluded [from] performance of our normal appellate review responsibilities within accepted legal and institutional channels," **Tricon Metals,** 516 So. 2d at 237, and noted that "[a]s a practical matter, we can better perform our function if we know what the trial court did, and why." **Id.** at 239. After considerable review of the present case, we conclude that certain of the plaintiffs' claims may yet have validity. However, we must remand to the lower court for more specific findings and conclusions for the reasons which follow.

**1. The Validity of the § 1983 Claim against Individual Defendants Howse and Cook**

¶20. *Hafer* allows Howse and Cook to be sued in their individual capacities under § 1983. Both parties in this appeal acknowledge that the standard from ***McDonnell Douglas Corp. v. Green***, 411 U.S. 792 (1973) is applicable in a suit under § 1983. The federal judiciary has acknowledged that the required elements of prima facie proof necessary for a plaintiff charging a racially hostile work environment under both Title VII and § 1983 are the same. ***Boutros v. Canton Reg'l Transit Auth.,*** 997 F.2d 198, 202 (6th Cir. 1993); ***Vaughn v. Pool Offshore Co.,*** 683 F.2d 922, 924 (5th Cir.1982); ***Lee v. Conecuh County Bd. of Educ.,*** 634 F.2d 959, 962 (5thCir. 1981) ("[l]ogic dictates that the McDonnell Douglas factors may be used to establish a prima facie case in cases of racially motivated employment discrimination brought under section 1983 whether or not Title VII is used as a parallel remedy"). *See also **Hamilton v. Rodgers,*** 791 F.2d 439, 442 (5th Cir.1986) (holding that proof of liability for a racially hostile work environment is the same under Title VII, 42 U.S.C.§ 1981 and § 1983).

¶21. In ***McDonnell Douglas***, the Court established three distinct procedural stages for proving discriminatory employment practices. First, the complainant must carry the initial burden of establishing a prima facie case of racial discrimination. Appellees argue that under this standard "Ramiah and Lakshmi had the burden of establishing by a preponderance of the evidence that they are members of a racial minority, that they were qualified for a particular position, and that similarly or less qualified persons were selected in their place." *See **McDonnell Douglas,*** 411 U.S. at 802; ***Lee v. Conecuh County Bd. of Educ.,*** 634 F.2d 959 (5th Cir. 1981). After a prima facie case is made, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. *Id.* at 962. Until recently, the third prong of the ***McDonnell Douglas*** test required the plaintiff to prove by a preponderance of the evidence that the employer's professed non-discriminatory reason was merely a pretext for discrimination. ***McDonnell Douglas,*** 411 U.S. at 804.

¶22. This standard was somewhat altered in the recent case of ***St. Mary's Honor Center v. Hicks,*** 509 U.S. 502 (1993). Under ***Hicks,*** the first two steps of the ***McDonnell Douglas*** test remain essentially the same. ***Hicks,*** 509 U.S. at 506-10. The plaintiff must prove a prima facie case and the employer then has the burden to produce a non-discriminatory reason for the discharge. *Id.* Should the employer meet this burden, the plaintiff is then required to prove by a preponderance of the evidence "'that the defendant intentionally discriminated against [him]' because of his race" or gender. *Id.* at 511 (citation omitted). While "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination," *Id.,* simply disproving the defendant's non-discriminatory explanation, in and of itself, is no longer sufficient to establish a claim of unlawful discrimination. Rather, the plaintiff must prove that the defendant was impermissibly motivated by the plaintiff's race in taking its adverse personnel actions. *Id.* at 517-18. Thus, under ***Hicks***the chancellor's rejection of the defendants ' asserted reasons for their actions does not entitle Ramiah and Lakshmi to judgment as a matter of law on the grounds of racial discrimination. As the State correctly argues, they must prove discriminatory intent.

¶23. As to the plaintiffs' prima facie case, the appellees are Asian-Indians which classify them as minorities. Both have Ph.D.s in the field of science and have conducted research that has been published in scholarly journals. Testimony was given at trial that their qualifications were never in question. However, it is not entirely clear whether others were selected in their place. While the appellees contend that they were replaced by one Harriet Perry, this is not clearly supported by the

record. Ms. Perry occupies the physical space where the appellees formerly worked. However, she is nominally assigned to the Fish Research and Development Section. Additionally, there are indications that others were hired after the appellees were fired, but whether these people were hired to replace Appellees is uncertain. The Physiology Section, at least in form, was closed. However, on remand, the lower court should make specific factual findings as to whether employees who were rehired after the termination of the plaintiffs were hired to replace them.

¶24. Assuming that Ramiah and Lakshmi established a prima facie case of racial discrimination, the burden shifted to Howse and Cook to articulate some legitimate, nondiscriminatory reason for the employee's rejection. The appellants argue that Ramiah and Lakshmi were lawfully terminated under a reduction in force plan.

¶25. In May of 1986 a Reduction in Force Plan was authorized by IHL that stated the following:

> According to the Gulf Coast Research Laboratory's "Reduction in Workforce" policies, the Director declares that, due to the institution's Fiscal Year 1986-87 budget cuts, a reduction in programs, services, and positions is now necessary.

The Reduction in Force plan was a reaction to a financial crisis that GCRL expected to experience for the 1986-87 fiscal year. According to calculations made by GCRL business engineer, Kris Fulton, GCRL had for the 1986-87 fiscal year projected revenues of $2,873,533 and expenditures of $3,567,919, which would yield a deficit of $694,386, or twenty-four percent. As a result of these projections, a report was submitted to IHL which indicated that a substantial reduction in personnel and additional reductions were needed to deal with the deficit.

¶26. The record is unclear as to whether the financial exigency was genuine. The appellees allege that the financial crisis was "over before it began." They contend that there were no economic problems severe enough to justify the declaration of a financial exigency at GCRL. As evidence of this they indicated significant expenditures were made during the period of financial exigency:

> [C]ertain favored scientists at the GCRL spent money as though no crisis had ever existed. Hundreds of thousands of dollars of the funds granted by the U.S.D.A. for shrimp research were utilized by GCRL to purchase electron microscopes and for extensive and expensive travel by various employees of GCRL throughout the "exigency." Employees who remained at GCRL during the "financial exigency" were actually given raises, and little consideration was given the obligation of the GCRL to reemploy, where possible, its lost employees even though the money was clearly available to do so.

¶27. The defendants, on the other hand, argue that fiscal realities had to be met which were brought on when GCRL was notified that its appropriation would be reduced. The appellants contend "there is simply no proof that Defendants acted in concert to deny Plaintiffs any constitutionally protected rights in making a determination how the budget at GCRL could be reduced." The chancellor's findings are ambiguous on this point. He observed only that "[w]hatever financial exigency that may have existed lasted less than 30 days." Thus, on remand, it must also be clarified as to whether Howse and Cook have articulated a legitimate and facially nondiscriminatory reason for terminating Ramiah and Lakshmi. This hinges on a specific factual finding of whether the financial exigency was genuine.

¶28. Finally, the plaintiffs must prove discriminatory intent on the part of the defendants. In the context of racial discrimination, this has typically meant that an action is not unconstitutional *solely* because it has a racially disproportionate impact. *See **Washington v. Davis,*** 426 U.S. 229, 238-42 (1976); ***Vera v. Tue,*** 73 F.3d 604, 609 (5th Cir. 1996). Ramiah and Lakshmi allege various claims under federal law, including an argument that the reduction in force plan was part of a conspiracy to discriminate against them and displace them from their positions at GCRL. Under all of these theories, the plaintiffs are required to establish a discriminatory motive on the part of the defendants. "In order to state a claim of racial discrimination under the Equal Protection Clause and § 1983, the plaintiff must demonstrate that the governmental official was motivated by intentional discrimination on the basis of race." ***Coleman v. Houston Indep. Sch. Dist.,*** 113 F.3d 528, 533 (5th Cir. 1997). "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." ***Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,*** 429 U.S. 252, 265 (1977). Likewise, a cause of action for racial discrimination in the making and enforcement of contracts, under § 1981, requires the plaintiff to demonstrate intentional discrimination. ***General Bldg. Contractors Ass'n, Inc. v. Pennsylvania,*** 458 U.S. 375, 391 (1982); ***National Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio,*** 40 F.3d 698, 714 (5th Cir. 1994). Finally, to recover damages for a conspiracy to deny individuals the equal protection of the laws under § 1985 the plaintiff must demonstrate that the defendants were motivated by an invidious discriminatory animus. ***Griffin v. Breckenridge,*** 403 U.S. 88, 102 (1971); ***Almon v. Sandlin,*** 603 F.2d 503, 505 (5th Cir. 1979).

¶29. The chancellor's findings on the issue of discriminatory intent are insufficiently specific to give this Court confidence that a proper legal standard was applied. The chancellor placed heavy emphasis on the fact that only one minority employee remained at GCRL after the terminations, and found that "[e]ven though the evaluation plan had the facade of fairness, . . . [t]he number of minorities affected is beyond coincidence and the evidence presented shows a pattern of discrimination, whether intentional or not, because Affirmative Action was ignored." Thus, it seems the lower court based its conclusion on the perceived disparate impact that the chosen terminations had on the minority employees of GCRL. Moreover, the chancellor's equivocation on the issue of whether the defendants' actions were "intentional or not" is evidence of a mistaken view of the applicable standard under federal law. Thus, we reverse and remand on this point for more definite findings and conclusions as to the issue of the defendants' discriminatory intent.

¶30. We note that there is some support in the record that Defendants Howse and Cook intentionally discriminated against Ramiah and Lakshmi. The chancellor found that the Affirmative Action Plan at GCRL was suspended. In addition, the record supports a reasonable inference that the criteria designed by the defendants conveniently targeted the Physiology Section and in particular Drs. Ramiah and Lakshmi. Dr. Cook agreed that although Ramiah and Lakshmi had the most seniority of the senior staff at GCRL, this factor was given little if any consideration in the reduction in force. The time period during which review of grants and funding were measured began right after Dr. Ramiah had suffered a heart attack and was temporarily unable to seek funding. The plaintiffs also asserted that the time period began right after a period in which Dr. Cook had brought in no significant funding, and that the three-year period for review of publications began immediately after Dr. Ramiah's last major publications. Three witnesses, Dr. Edwin W. Cake, Jr., Dr. James T. McBee, Jr., and Dr. John P. Steen, Jr., testified that the criteria used to judge the productivity of the various

sections at GCRL were unfair.

¶31. In addition, Lakshmi testified that the appellees were confronted with a work environment that was not free of racial animus, and that when she told Howse about it he denied that it existed. Ramiah and Lakshmi were the only minorities on the senior scientific staff at the time the reduction in force was implemented and both were terminated.

¶32. There is also the question of whether the Physiology Section of GCRL rationally fits into the category of "expendable." According to Dr. Howse, the primary reason the Physiology Section of GCRL was targeted by the reduction in force plan was because the Physiology Section was considered "peripheral" to the major function of GCRL. In particular, the factors for eliminating the Physiology Section were

> 1) Physiology is an expensive section to maintain; 2) the section does not have any outstanding contract obligations; 3) Physiology has not been a discipline which is central to the focus of the Laboratory.

¶33. The contention that the Physiology Section was expensive to maintain may have some validity in comparison to the other sections at GCRL. In the five year period preceding the financial exigency, the period picked by Howse and Cook to measure the relative productivity of the various sections, the Physiology Section ranked fourth lowest out of seventeen sections in terms of the ratio of state funds to outside funds used to finance operations. In terms of actual dollars necessary for operations during this time, Physiology ranked fourth most expensive. However, Cook admitted in his testimony that if the period of measurement had been several years longer, the funding credited to the Physiology Department would have been significantly more. From the record, it appears that from 1978 to 1980 the plaintiffs received a grant of $200,000.00, and from 1980 to 1981 they received a grant of $125,000.00. In terms of the number of journal publications each section had between 1981 and 1984, the Physiology Section placed ninth. In comparisons regarding the number of proposals funded for research Physiology ranked eighth. Therefore, the fact that the Physiology Section was not the most productive section at GCRL, but did tally expenses in excess of the other sections tends to support the argument that the Physiology Section was expensive to maintain.

¶34. The record indicates that the Physiology Section had two outstanding contract obligations at the time Appellees were hired that roughly equaled half of their salaries or $55,000. According to deposition testimony by Kris Fulton there was about $55,000 in outstanding grant funds that the Physiology Section did not get to because of the reduction in force.

¶35. The issue of whether the Physiology Section was expendable or peripheral to GCRL is extremely difficult. The testimony given by Dr. Howse as to the meaning of "peripheral" reveals the difficulty in determining the importance of the Physiology Section.

> That doesn't mean that it is not vital. That doesn't mean that it is not desirable. That simply means it is not in the central focus. My philosophy, my actions, since I've been Director is trying to take to the Legislature a plan that we want to develop a well balanced marine laboratory. That would include a number of different areas of discipline, disciplines that we don't have and Physiology would be one of them, Biochemistry would be another, Genetics would be another; Zoology would be another. Those are all vital, but some of them would be peripheral.

The Physiology Section was thus described as both vital and outside the central focus of GCRL. From an objective reading of GCRL's "Personnel Policies and Procedures Gulf Coast Research Laboratory Handbook for Employees" there is no designation among any of the general research sections as peripheral or non-peripheral. In addition, there is strong evidence that the Physiology Section was well-respected because of its work in the field of ecological research.[(2)] The Physiology Section's relationship with several organizations in the environmental research community was outstanding. Thus, a fair-minded factfinder could conclude that the Physiology Section was not an expendable or peripheral part of GCRL's operation.

¶36. While this evidence is not overwhelming, we cannot conclude that when considered as a whole the record is so lacking in evidence of discriminatory animus on the part of the defendants as to support a judgment as a matter of law in their favor. Thus, we decline to render a decision for defendants in this case.

## 2. The State Claims

¶37. The appellants listed numerous state claims in their complaint. In Count I the plaintiffs alleged that the defendants acted in concert to accomplish unlawful purposes, most notably to breach their respective contracts of employment. In Count II of the complaint, Ramiah and Lakshmi charged that the defendants intentionally interfered with their contractual relationship with GCRL. In Count III they charged that the defendants interfered with their prospective economic advantages. These three charges are directed at the individual Defendants Howse and Cook, and thus will not support a judgment against GCRL. In any event, Counts I, II and III are torts and there is little doubt that GCRL would be protected from such claims by the doctrine of sovereign immunity. Where suits are grounded in tort, agencies of the state may not be sued absent a "clear and unambiguous statute waiving sovereign immunity." *Employers Ins. of Wausau v. Mississippi State Highway Comm'n,* 575 So. 2d 999, 1002 (Miss. 1990).

¶38. In Count IV of the complaint, however, the plaintiffs charged that GCRL unlawfully breached their respective contracts of employment as a result of GCRL's policies and practices of discrimination based on race and national origin and because the plaintiffs refused to compromise ethical and scientific standards. If this claim--for which injunctive relief was sought--is supported by the chancellor's findings, then GCRL is not immune. Sovereign immunity only applies to tort claims, and should not be construed to immunize governmental authorities and agencies from suits other than for money damages. *Fordice v. Thomas,* 649 So. 2d 835, 839-40 (Miss. 1995).

¶39. Whatever immunity may apply to these various state claims, and whatever validity the claims may in fact have, this Court is concerned that these claims were never considered or ruled upon by the lower court. The chancellor's findings and conclusions focus upon the plaintiffs' § 1983 claim--perhaps because he felt that consideration of these claims was unnecessary. The chancellor's Supplemental Opinion Number 2 consists of a list of references, almost exclusively consisting of federal law, which he supposedly considered in rendering judgment. However, such a listing does not constitute conclusions of law, for they do not instruct this Court of the reasons the lower court ruled as it did. As such, we are "virtually precluded [from] performance of our normal appellate review responsibilities within accepted legal and institutional channels." *Tricon Metals,* 516 So. 2d at 237.

¶40. We note that these contract-related issues depend initially on whether a valid contract for permanent employment can be said to have existed between the plaintiffs and GCRL even though no written contract existed. There is evidence in the record that the plaintiffs considered their employment to be permanent, and testimony by Dr. Gunter indicates that he originally hired them as permanent employees. The claim for a breach of an oral contract for a definite term, if with a basis in fact, takes the case outside the operation of the presumption of at will employment. Controverted testimony regarding the contemplated length of employment creates an issue of fact as to the existence of an oral contract for a definite term *vel non. Bowers Window & Door Co. v. Dearman,* 549 So. 2d 1309, 1313 (Miss. 1989); *Short v. Columbus Rubber & Gasket Co.,* 535 So. 2d 61, 64 (Miss. 1988). The chancellor did find that Dr. Gunter "actively solicited the employment of Dr. Venkataramiah and Dr. Lakshmi at GCRL and maintained permanent employees consistent with the policy of his administration as Director of GCRL . . . ." We cannot say that this finding of fact is manifestly erroneous, and thus it can fairly be established that the plaintiffs had permanent contracts of employment with GCRL.

¶41. However, even assuming that a contract of employment existed, GCRL may have argued a defense under the Statute of Frauds. To be enforceable under the statute, there must be sufficient written evidence to substantiate the contract. Miss. Code Ann. § 15-3-1(d) (1995); *Bowers,* 549 So. 2d at 1313. Moreover, the length of employment is a substantial term which must be included in the writing. *Id.*; *Short,* 535 So. 2d at 64. In the present case, no written contract of employment existed. Thus, the dispositive issue may be whether the doctrine of equitable estoppel applies as an exception to the Statute of Frauds. This doctrine applies as an exception to the statute where the plaintiff shows "(1)that he has changed his position in reliance upon the conduct of another and (2) that he has suffered detriment caused by his change of his position in reliance upon such conduct." *PMZ Oil Co. v. Lucroy,* 449 So. 2d 201, 206 (Miss. 1984).

¶42. As we observed in *PMZ,* the failure by the chancellor to make an express finding of detrimental reliance is not fatal where the finding is necessary to the result reached by the lower court. *Id.* at 205. However, the opinions of the court in this case make it uncertain whether these issues were ever considered by the chancellor, and thus, it is unclear whether the state claims were valid. Thus, on remand, the lower court should consider these various state law claims and make specific findings and conclusions as to the validity of each.

¶43. We note further that if the chancellor finds that the contract of employment was enforceable, the possibility still exists that the plaintiffs were terminated for permissible cause under the financial exigency, since even tenured employees can be terminated under valid reduction in force plans. Thus, the ultimate validity of the state claims likely rises or falls on the same evidence as the § 1983 claim against Howse and Cook. That is, much depends on the chancellor's finding on remand that the financial exigency was genuine, and whether the defendants acted against the plaintiffs out of unlawful racial animus. *See Cenac v. Murry,* 609 So. 2d 1257 (Miss. 1992) (all contracts contain implied covenants of good faith and fair dealing in performance and enforcement). *See also* Restatement (Second) of Contracts § 205 (1981).

V.

¶44. In Count V of the Complaint, Ramiah and Lakshmi charged that the defendants, by their actions,

tortiously violated their constitutional rights by depriving them of due process. We address first the procedural aspects of this claim. The chancellor made a finding that the appeal procedure of the reduction in force plan was arbitrary and capricious. The appellants claim the decision by the trial court was manifest error because the appellees were granted the appropriate notice and hearing consistent with the due process standard articulated in *Goss v. Lopez*, 419 U.S. 565 (1975) and *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78 (1978).

¶45. For any due process claim to succeed against a state or state agency, the alleged wrongful conduct must be a product of state action. *National Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 190 (1988); *Shelley v. Kraemer,* 334 U.S. 1, 13 (1948); U.S. Const., Amend. XIV, § 1. There is little doubt here that the actions of Howse and Cook constituted state action. "'The involvement of a state official . . . plainly provides the state action essential to show a direct violation of petitioner's Fourteenth Amendment . . . rights, whether or not the actions . . . were officially authorized, or lawful.'" *Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 157 n.5 (1978) (*quoting Adickes v. S. H Kress & Co.,* 398 U.S. 144, 152 (1970)).

¶46. Ramiah and Lakshmi claim they had a property right to continuing employment at GCRL which was denied as a result of the reduction in force plan. They further argue that the hearing provided to appeal their employment dismissal was too narrow in scope and conducted by persons incapable of providing a fair and impartial hearing. Although the appellants use the U.S. Supreme Court holding from *Goss* and *Horowitz*, the due process standard stated in *Perry v. Sindermann*, 408 U.S. 593 (1972) has a more salient application to this appeal. In *Sindermann* the plaintiff served as a college teacher for many years, but in 1969 found that his one-year employment contract was terminated. Sindermann's termination was not preceded or followed by an official statement of the reasons for nonrenewal and no opportunity for a hearing to challenge the basis of the nonrenewal was granted. *Id.* at 595. In a five-to-four decision, the Supreme Court stated that where a college teacher alleges that rules and understandings have been promulgated by state officials to promote continued employment a hearing must be granted to give the teacher an opportunity to substantiate his claim to such continuing employment. *Id.* at 602.

¶47. In this appeal, the appellees allege they had a property right to a tenured faculty position at GCRL. GCRL did not grant the appellees tenure nor was anyone employed at GCRL granted tenure. According to testimony given by Dr. Howse, all employees at GCRL are employed on a year-to-year basis provided that satisfactory performance is maintained. William R. Cleere, Executive Director of the Board of Trustees for IHL, testified that the By-Laws and Policies of IHL require that a tenure committee shall be established at each institution under its jurisdiction, and that GCRL was not exempt from any of the by-laws and policies of IHL. Ramiah and Lakshmi argue that because GCRL failed to have a tenure committee they were denied tenure in violation of IHL by-laws and policies. Dr. Cleere testified, however, that he was not in favor of tenure at GCRL and that IHL did not intend to grant tenure to the faculty at GCRL because it was not a degree-granting institution but a research site.

¶48. This Court has held that before a claim of due process can be successful there must be a property or liberty interest in jeopardy that requires protection. *Wicks v. Mississippi Valley State Univ.*, 536 So. 2d 20, 22 (Miss. 1988). The appellees argue that their property and liberty rights have been violated because of their loss of employment at GCRL. Based on assurances provided by

administrators at GCRL and the requirement for a tenure committee at each institution under IHL authority as stated in its by-laws and policies, they contend that their expectation in continued employment at GCRL merits due process protection.[(3)]

¶49. In *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972), the plaintiff was employed under a one-year contract that was not renewed and he was not provided with a hearing to challenge the merits of the decision not to rehire him for a teaching job. The plaintiff claimed that he had a property interest in being rehired to the teaching position and that the State had deprived him of that property interest without due process. The *Roth* Court found no property interest deserving of due process protection.

¶50. Arguably, the property interest in this case is legitimate. *See Bishop v. Wood*, 426 U.S. 341 (1976). It is true that no one has been granted tenure at GCRL. Also, the distinction between GCRL and a university granting degrees appear to suggest that a programmatic reason exists for not granting tenure to employees at GCRL. These are different types of institutions that offered its employees different benefits. The question, however, is whether there was a responsibility to clarify the difference between those benefits. The Court in *Wicks* held that "a property interest in employment must be decided by reference to state law." *Wicks*, 536 So. 2d at 23. Section 37-101-21, Miss. Code Ann. (1996), holds that IHL shall prescribe rules, regulations, and policies at GCRL. Moreover, there is testimony by Dr. Cleere that GCRL was not exempt from any by-laws or rules of IHL. Ramiah and Lakshmi validly contend that they had a property interest in continuing employment that was equal or close to tenured employment. The appellees were hired by a GCRL official without a written contract but with an understanding of permanent employment. The appellees in this case had more than a mere subjective expectation of permanent employment. *Wicks*, 536 So. 2d at 23. GCRL failed to establish the tenure committee as per IHL by-laws which deprived the appellees of explicitly tenured employment.

¶51. Once the appellees were terminated pursuant to the reduction in force plan they were granted a hearing to challenge their dismissal. According to testimony by Dr. Cook, the purpose of the appeal was to provide those dismissed the chance to challenge their dismissal if they felt their dismissal was unfair, arbitrary or capricious. An appeal panel was assembled consisting of three members of GCRL. The panel submitted a report finding that the dismissals were reasonable and fair.

¶52. The claim by Ramiah and Lakshmi that the appeal panel did not meet due process requirements does not have merit. They contend that the appeal panel was biased and prejudicial, and that the scope of the inquiry was too narrow. A review of Exhibit 11, which explains the panel's findings, indicates that Appellees were allowed to have legal counsel present, call witnesses, and submit documents for the panel to consider prior to rendering its decision. With regard to the Appellees' major concern that the panel members were not impartial, no proof of this allegation exists. It is interesting to note that Appellees only made one objection as to the composition of the panel. This objection was honored and the panel member in question was removed and replaced by another. The appellees were provided procedural due process consistent with the rule of law as explained by the United States Supreme Court. *Perry v. Sindermann*, 408 U.S. 593 (1972); *Goss v. Lopez*, 419 U.S. 565 (1975); *Board of Curators of the Univ. of Missouri v. Horowitz*, 435 U.S. 78 (1978). We thus render a decision on that issue.

¶53. While not adequately explained in the conclusions of the lower court nor expressly argued as such in the appellees' brief, within Count V of the Complaint is also a Fourteenth Amendment substantive due process attack against GCRL, a claim which relates to the reduction in force plan under which the Physiology Section was closed and the appellees were terminated.[(4)] The Supreme Court has declared that the Due Process Clause "not only accords procedural safeguards to protected interests, but likewise protects substantive aspects of liberty against impermissible governmental restrictions." *Harrah Indep. Sch. Dist. v. Martin,* 440 U.S. 194, 197 (1979); *Kelley v. Johnson,* 425 U.S. 238, 244 (1976). For the most part, the federal courts considering substantive due process claims by state college or university faculty have applied this approach to property interests as well. *See, e.g., Agarwal v. Regents of the Univ. of Minnesota,* 788 F.2d 504, 507-08 & n.2 (8th Cir. 1986); *Russell v. Harrison,* 736 F.2d 283, 286-92 (5th Cir. 1984); *Milbouer v. Keppler,* 644 F. Supp. 201, 204-06 (D. Idaho 1986). Each of these cases involved both procedural and substantive due process claims, and in each the court made one determination that a property interest existed. As discussed above in the context of procedural due process, the record in the instant case supports a finding that Appellees had a property interest in continued employment.

¶54. The test for a violation of substantive due process is whether the governmental action is rationally related to a legitimate governmental purpose. *See, e.g., Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 124-25 (1978); *Everhart v. Jefferson Parish Hosp. Dist. No. 2,* 757 F.2d 1567, 1571 (5th Cir. 1985). In the context of educational and other state institutions, the test has been used interchangeably with the "arbitrary and capricious" standard. *See, e.g., Kelley,* 425 U.S. at 247-48. The Fifth Circuit has held that to reach the jury with a substantive due process claim, the plaintiff "must demonstrate a genuine issue of material fact about his protected property interest . . . and the university's arbitrary or capricious deprivation of that interest." *Honore v. Douglas*, 833 F.2d 565, 568 (5th Cir. 1987).

¶55. For a termination based on financial exigency to satisfy substantive due process, it normally must be shown that: (1) a genuine financial exigency existed, and (2) some rational decision making process was used to select the tenured faculty who were discharged. *See, e.g., Brenna v. Southern Colorado State College,* 589 F.2d 475 (10th Cir. 1978) (college's selection criteria found to be reasonable, based on substantial evidence, and made in good faith); *Bignall v. North Idaho College,* 538 F.2d 243, 249-50 (9th Cir. 1976) (procedures for termination proper because administrator formulated guidelines applicable to all faculty, consulted with all department heads and considered their evaluations as well as the school's needs, and evidence indicated that plaintiff not well qualified academically); *Milbouer,* 644 F. Supp. at 205 (when eliminating German department administrator made various statistical analyses that supported the elimination). *See* Michael J. Phillips, *The Substantive Due Process Rights of College and University Faculty,* 28 Am. Bus. L.J. 567, 587-88 & n.116 (1991).

¶56. In the Fifth Circuit case of *Russell v. Harrison,* 736 F.2d 283 (5th Cir. 1984), the plaintiffs alleged that their Fourteenth Amendment rights to due process were substantively violated in connection with their dismissal because neither of the universities who employed them was "acting pursuant to any valid Reduction in Force Policy" when they terminated plaintiffs' contracts of employment; nor did the Board of Trustees have a "uniform Reduction in Force Policy ... applicable

to the system as a whole." **Russell,** 736 F.2d at 287. The defendants' motion for summary judgment on the substantive due process claim was granted, based on affidavits and testimony which indicated that a genuine financial emergency existed at the two universities, and that plaintiffs' contracts of employment had been terminated based on an analysis of the most efficient staffing per full-time student. The evidence established that the dismissals and salary reductions were based on uniform criteria bearing a reasonable relationship to the universities' financial problem. After noting that "'[t]he Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions,'" the court concluded that "this evidence showed that whether or not defendants' actions were wise, at the least the actions were not arbitrary and capricious, or racially motivated." **Russell,** 736 F.2d at 288 & n.8 (*quoting* **Bishop v. Wood**, 426 U.S. 341, 350 (1976)).

¶57. In the instant case, the chancellor found that "[n]o reasonable pattern can be found in the evaluations and recommendations made by Dr. Cook to Dr. Howse." As we have discussed, the findings and conclusions of the chancellor are insufficient in regard to whether the financial exigency was contrived, and whether the defendants designed the criteria for implementing the reduction in force for purposes of intentionally discriminating against Ramiah and Lakshmi. However, if either of these can be shown to be the case on remand, then the terminations of Ramiah and Lakshmi can fairly be said to be arbitrary and capricious, thus violating their substantive due process rights.

VII.

¶58. In the original opinion, the Chancery Court of Jackson County, Mississippi, granted damages to Dr. Ramiah and Dr. Lakshmi in the amount of $94,124.50 and $83,095.11 respectively. In a subsequent opinion the chancellor increased the damage awards to $210,000 and $180,000 respectively. The State argues that the damage awards were improperly computed and should be reversed. The plaintiffs urge this Court to embrace the rule from **Wall v. Swilley**, 562 So. 2d 1252 (Miss. 1990):

> Whatever the measure of damages, they may be recovered only where and to the extent that the evidence removes their quantum from the realm of speculation and conjecture and transports it through the twilight zone and into the daylight of reasonable certainty.

**Id.** at 1256.

¶59. In the original opinion the chancellor indicated that the amounts of the judgments were based on the plaintiff's former positions, the duty of the plaintiffs to mitigate damages, and the offer by GCRL to rehire the plaintiffs. In Supplemental Opinion Number Three, he stated that because a settlement was not achieved the relief granted in the Court's original Opinion was inadequate. No other reason is given for the award increase. Thus, the increase cannot be attributed to any evidence, and at the very least begs for clarification. Hence, conditional upon the outcome of the case on remand, the lower court is instructed to clarify the issue of damages.

¶60. The State also argues that the appellees failed to mitigate damages. The opportunity for Appellees to mitigate damages was provided when GCRL invited them to assume their previous positions at the lab. The State contends that the offer of re-employment would not require Ramiah and Lakshmi to forfeit any right to seek additional relief from GCRL. The State relies on **Williams v. Albemarle City Board of Education,** 485 F.2d 232 (4th Cir. 1973), which articulates the duty to

mitigate damages where the employment ". . .opportunity was immediately at hand, without forfeiture of any right to sue and recover for any unsatisfied deprivation." *Id.* at 233. The appellees argue that this re-employment required them to sign a contract which did not allow the same opportunities that they allege existed in their previous positions, therefore casting the re-employment opportunity outside the realm of "substantially equivalent employment." *O'Neal v. Gresham*, 519 F.2d 803 (4th Cir. 1975).

¶61. The trial court found that the offer of re-employment was not genuine. The fact remains, however, that a chance to earn the compensation that the appellees later argued as damages was available. The duty to mitigate has long been a part of Mississippi's jurisprudence and in this case Appellees failed to act consistently with that duty. *Birdsong v. Ellis*, 62 Miss. 418 (1884). Therefore, this issue as well should be clarified on remand. Finally, the issue of attorneys' fees is dependent on the success of Appellees' § 1983 claim against individual Defendants Howse and Cook. It should be noted that the award of attorneys' fees is a statutory remedy granted in 42 U.S.C. § 1988(b), and is applicable only to the § 1983 claim against individual Defendants Howse and Cook.

VIII.

¶62. For the foregoing reasons, the decision of the chancery court is reversed and remanded for further proceedings consistent with this opinion.

¶63. **REVERSED AND REMANDED.**

**SULLIVAN, P.J., AND WALLER, J., JOIN THIS OPINION. McRAE, J., JOINS IN RESULT ONLY AND ISSUES SEPARATE OPINION. PITTMAN, P.J., NOT PARTICIPATING.**

**McRAE, JUSTICE, DISSENTING, DELIVERS THE FOLLOWING OPINION:**

¶64. The majority notes that there is some evidence in the record to support a finding of intentional discrimination. If this is so, then our standard of review compels us to affirm the chancellor's findings. "[T]he chancellor below made his determination based on conflicting testimony. Under our standard of review in this situation, we are inclined to defer to the discretion of the chancellor." *Weathersby v. Weathersby*, 693 So. 2d 1348, 1353 (Miss. 1997). "If a chancellor's findings are supported by substantial, credible evidence, this Court will not reverse." *Merchants & Planters Bank of Raymond v. Williamson*, 691 So. 2d 398, 402 (Miss. 1997); *Branton v. Branton*, 559 So. 2d 1038, 1042 (Miss. 1990). However, even when there is some evidence, substantial evidence, or conclusive evidence in the record on appeal--as opposed to no evidence or insufficient evidence--supporting a finding, this Court should defer to the conclusions of the fact finder. Here the chancellor found some evidence to support final judgment in favor of Amaraneni, as administrator of the estate of Venkataramiah, and Lakshmi.

¶65. Final judgment in this case was entered on January 19, 1991. More than seven years later, we are telling the litigants that they must go back to trial. Is this what we call justice? This Court should affirm the chancellor below.

¶66. Uniform Chancery Court Rule 4.01 and Mississippi Rule of Civil Procedure 52 authorize the

court to make specific findings of fact and state separately its conclusions of law thereon. While Miss. R. Civ. P. 52 gives the court discretion to make such findings absent a party's request, it further provides, as does Uniform Chancery Court Rule 4.01, that a chancellor "shall" make such findings when required or requested by a party to the suit. In this case Amaraneni made a specific request for additional findings of fact and conclusions of law revealing the basis of GCRL's liability. The chancellor complied with the requirements of both rules by providing several supplemental opinions to the parties. As a result, this Court is not faced with the same problems as the Court in *Tricon Metals & Services, Inc. v. Topp*, 516 So. 2d 236, 239 (Miss. 1987), which is cited by the majority. Here we have sufficient facts to apply the implied findings doctrine, allowing us to assume that the chancellor made determinations of fact sufficient to support his judgment. Since Rule 52 and 4.01 are not jurisdictional, this Court may decide this appeal without further findings.

¶67. The chancellor got it right and I would affirm his decision. The State failed to meet its burden of showing otherwise. The record now before this Court is replete with more than two thousand omissions by the court reporter, which was not the fault of the appellees. The court reporter further stated that the the record would have been 5,000 pages but she only transcribed 1,988 pages, leaving more than 3,000 pages not transcribed. The testimony of several key witnesses for the plaintiff, including one who has since had a stroke and is now unable to testify, was not transcribed where the tapes were inaudible. A court reporter assisting in the transcription process stated in her affidavit that some of the recordings were so bad that they had to "rough in" what had been said. Even the chancellor's notes were used as testimony in the case; the majority, nevertheless, finds that his findings were "not corroborated by the record."

¶68. Every effort was made to have the record in this case corrected; it was not. Sixteen exhibits remain missing. Numerous motions to compel and for sanctions were filed to no avail. The court reporter since has retired, leaving a record still laden with omissions.

¶69. It is the appellant who is responsible for presenting to this Court a record of trial proceedings sufficient to support his assignments of error. *Winters v. State*, 473 So. 2d 452, 457 (Miss. 1985). The majority should not penalize the appellees in this case due to the appellants' errors and then turn around and reward the appellants for supplying a record with more than 3,000 pages and multiple exhibits missing. *See Williams v. State*, 178 Miss. 694, 172 So. 746 (1937)(denying writ of certiorari requesting enlargement of record on appeal where movant failed to properly include exhibits within record in court below). That said, we should rely not on the record, but on the chancellor's findings. However, in view of the fact that there are two separate opinions written, one to reverse and the other to reverse and remand for a new trial, I join Justice Banks' opinion to remand so that the appellees will have an opportunity to retry the case. I still maintain, however, that the chancellor's findings should be affirmed.

## MILLS, JUSTICE, DISSENTING, DELIVERS THE FOLLOWING OPINION:

¶70. Our inquiry now focuses upon whether the record contains evidence sufficient to allow a reasonable trier of fact to conclude as the chancellor did in the trial court. *Molnar v. Ebasco*

*Constructors, Inc.*, 986 F.2d 115, 118 (5th Cir.1993). "In a disparate treatment case involving an individual, the plaintiff initially has the burden of showing a prima facie case of discrimination." *Carroll v. Sears, Roebuck & Co.*, 708 F.2d 183, 195 (5th Cir.1983). A plaintiff meets this initial burden by demonstrating:

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applica[tions] from persons [who possessed the plaintiff's] qualifications.

*Anderson v. Douglas & Lomason Co.,* 26 F.3d 1277, 1297 (5th Cir.1994) (*quoting* *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the plaintiff is successful in this showing, the employer must show a legitimate, nondiscriminatory reason for the plaintiff's termination of employment. If the employer "carries this burden of production, the presumption raised by the prima facie case is rebutted" and drops from the case. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981). "'The plaintiff then has 'the full and fair opportunity to demonstrate,' through presentation of his own case and through cross-examination of the defendants' witnesses, 'that the proffered reason was not the true reason for the employment decision,' and that race was.'" *Anderson*, 26 F.3d at 1297 (*quoting* *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)). *"The plaintiff at all times bears the burden of persuading the court that he or she was the victim of intentional discrimination." Id.* [emphasis added].

¶71. As to the plaintiffs' prima facie case, the appellees are Asian-Indians. Both have Ph.Ds and have conducted research that has been published in scholarly journals. Their qualifications have never been in question. The plaintiffs' claim falls apart, however, when considering the final prong of the *McDonnell Douglas* test. An extensive review of the record reveals no evidence that the plaintiffs' former positions were filled by anyone. To the contrary, the entire Physiology Section of GCRL has been closed. The appellees contend that they were replaced by Harriet Perry. Ms. Perry occupies the physical space where the appellees formerly worked, but she was assigned to the Fish Research and Development Section. There are indications that others were hired after the appellees were fired, but whether these people were hired to replace appellees is at best, uncertain.

¶72. The massive record in this case fails to indicate that the plaintiffs' employment was terminated because of their ethnic origin or race. Furthermore, the plaintiffs made no attempt to show disparity in the qualified population of the labor force, as called for in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989). The only evidence supporting the plaintiffs' allegations is their unsupported belief that they were replaced by three workers assigned to research sections different from the plaintiffs' now defunct section. Anecdotal evidence and mere speculation does not support a finding that an employer followed an unwritten "policy" of discrimination. *Carroll*, 708 F.2d at 195-96.

¶73. The true crux of this claim is that the legislature appropriated less funding than normally available for GCRL. That forced the lab to look at alternate means of meeting its budget. The GCRL administration decided that the best way of handling the foreseen budget problem was to eliminate the entire Physiology Section of GCRL. Under this plan thirty-four people were terminated. Eight were minorities, and twenty-six were non-minorities. Budgeting and preparing for reductions in the workforce are intricate policy matters entrusted solely to the management of GCRL and IHL.

...[T]he courts have uniformly held that terminated faculty have no right to participate in formulating those criteria [whom to dismiss], and no right to a hearing prior to the decision to terminate. '[W]here lack of funds necessitate[s] releasing a sizeable number of the faculty, certainly it [is] peculiarly within the province of the school administration to determine which teachers should be released....'

*Texas Faculty Ass'n v. University of Texas at Dallas*, 946 F.2d 379, 385 (5th Cir.1991) (*quoting Levitt v. Board of Trustees*, 376 F.Supp. 945, 960 (D.Neb.1974.) The defendants are public officials serving the public trust. As such, they are mandated by state law to stay within the budgets provided for them. We should review their means of achieving this end with great deference. While public officials may not hide under a cloak of deference to conceal their discriminatory acts, it is always the plaintiff's burden to prove his case. The plaintiffs failed to do so in the case *sub judice*.

¶74. Accordingly, I would reverse the ruling of the Chancellor and find in favor of the defendants.

**PRATHER, C.J., ROBERTS AND SMITH, JJ., JOIN THIS OPINION.**

1. This Court recognizes that the chancellor who originally tried this case no longer sits on the bench. Thus, if the new chancellor is satisfied that he cannot make the required findings, he or she may elect to grant a new trial. Miss. R. Civ. P. 63(b).

2. There are several letters in the record that attest to the importance of the Physiology Section and its work with organizations conducting research.

3. These assurances related to statements made Dr. Gordon Gunter. Dr. Thomas F. Lytle, another research scientist at GCRL, indicated that he too was given assurances of continued employment but stated that he knew his employment status was not equivalent with tenure.

4. Appellees argued on the assumption that the § 1983 claim against the state would stand, and their allegations of due process violations are argued within this context. However, their claims were not pleaded exclusively as such, and thus a claim based directly on the Fourteenth Amendment's substantive aspects may be brought against GCRL as a State agency.