421 So.2d 1046 (1982)
Keith PRUETT
v.
CITY OF ROSEDALE, Mississippi.
No. 53222.
Supreme Court of Mississippi.
November 10, 1982.
W. Allen Pepper, Jr., Cleveland, for appellant.
Walls, Buck & Irving, Tyree Irving, Greenville, for appellee.
En Banc.
BOWLING, Justice, for the Court:
This cause involves the abolition of the judicially created principle of sovereign immunity. The appeal is from the Circuit Court of Bolivar County. Appellant Keith Pruett filed his tort action against the City of Rosedale contending he was injured through the negligence of the city. Appellee, the city, filed a demurrer which was sustained by the trial court. Both parties admitted that this action of the lower court was for the reason that the city was immune from tort suit involving the particular activities claimed to have caused appellant's injuries. In their briefs and oral argument before this Court, both parties only argued whether or not the city of Rosedale, a political subdivision of the state, was immune from suit under the sovereign immunity doctrine.
We say at the outset that we think the time has come to abolish the judicially created concept of sovereign immunity with certain qualifications. These qualifications shall be hereinafter discussed and listed specifically in the summary of the opinion.
To fully understand the import of our actions here, we need briefly to look at the history of "sovereign immunity." The doctrine *1047 was developed in England many years before this country came into being. The basis of the doctrine was "the King can do no wrong." The Revolutionary War was then fought for the purpose of severing our control by the mother country, including the King, who could do no wrong. Although the founding fathers disagreed with many of the activities of the English ruling powers, the basic laws later adopted by this state, as well as all others except one, were founded on the British law. This foundation carried over into it the sovereign immunity existing in Britain. We shall not lengthen this opinion by going into the reasons why, except to say that the governmental and business situations at the beginning of this country were such that the founding fathers thought sovereign immunity at that time was proper.
For a good many years now, state after state has decided that the principle that the King [state] can do no wrong is not a legal principle that should receive a blanket application in modern times. There are many examples of the inequities involved in this principle. Under modern times, it is disadvantageous to both members of the public and members of the sovereign state. For the layman, an appropriate example would be where a conservation officer while on business for the state and operating an uninsured state vehicle, in the process of trying to apprehend a violator, and for some negligent reason, lost control of the state vehicle and injures an innocent person, both the injured person and the state employee are in deep trouble. All the state has to do is say, "we are the sovereign king and you do not have a claim for your injuries received through no fault of yours." Furthermore, the state employee is subject to a personal suit and the entire matter would have a great chance of ruining two persons, both the state employee and the innocent member of the public.
We could continue and give many examples of why the absolute sovereign immunity doctrine is out of date in modern society and modern legal concepts. The inequity of the situation is articulated by examining our safety responsibility law which requires insurance coverage of all vehicles operated by persons, firms, co-partnerships, associations, etc., but expressly provides that such requirements do not apply with respect to any motor vehicle owned by the State of Mississippi or any subdivision of this state. The injustice of this legal prohibition as explained in the above set out example is obvious.
We hasten to say that the legislature has authorized a certain few of the agencies and political subdivisions to carry insurance and also abolished the immunity of the sovereign to the limit of the insurance carried. We would have hoped that this action by this time would have been extended to protect all citizens who might be injured by the sovereign, but this has not been done. This leaves us to say as we shall hereinafter discuss in more detail, that in our opinion, the control and policing of sovereign immunity is a legislative responsibility and not that of the judiciary. The sovereign immunity doctrine is a creature of the judiciary. We are of the opinion that it should not be so; but that as said above, the details of handling the question is legislative rather than judicial. As has been said by many of the states' highest courts, the judicial branch is leaving the matter to the legislative branch. It was judicially created and necessarily should be judicially abrogated.
Research reveals that practically all of the states have abrogated and abolished the sovereign immunity doctrine. The vast majority has done so completely, some have retained certain prohibitions. There are only six [including Mississippi] which have not taken any action or have not clarified their positions. Our sister states of Louisiana, Alabama and Florida have abolished the immunity of the sovereign. The Supreme Court of Louisiana in Board of Commissioners of the Port of New Orleans v. Splendour Shipping & Enterprises Co., Inc., 273 So.2d 19 (La. 1973), in abolishing immunity mentioned three basic reasons: (1) that it was manifestly unfair to the injured persons; (2) that it tends toward governmental irresponsibility; and (3) it is an unnecessary exception to the policies of the state as set *1048 forth in its constitution. The Louisiana Court stated:
Governmental responsibility is needed more today than ever. There is hardly any sector of private life and activity free from governmental intervention. The myriad State agencies and their employees almost defy inventory, to say nothing of control by the people whom they purport to serve. It has not been the policy of the legislature to permit employees of agencies to injure, intentionally or carelessly, private citizens. It is and should be the policy of the State, enforced through its courts, to require boards and agencies to act responsibly, or be subject to answer in court.
In connection with a study of the Louisiana opinion, we note Article III, Section 24, Mississippi Constitution 1890, which reads as follows:
All courts shall be open; and every person for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice shall be administered, without sale, denial, or delay.
The Alabama Supreme Court in Lorence v. Hospital Board of Morgan County, 294 Ala. 614, 320 So.2d 631 (1975), in abolishing the doctrine of sovereign immunity said:
We do not overrule old case law lightly or flippantly. But, where precedent can no longer be supported by reason and justice, we perceive it our duty to reexamine, and if need be, overrule court made law.
The Supreme Court of Florida in Hargrove v. Town of Cocoa Beach, 96 So.2d 130 (1957), said:
The immunity theory has been further supported with the idea that it is better for an individual to suffer a grievous wrong than to impose liability on the people vicariously through their government. If there is anything more than a sham to our constitutional guarantee that the courts shall always be open to redress wrongs and to our sense of justice that there shall be a remedy for every wrong committed, then certainly this basis for the rule cannot be supported.
It would be enlightening to quote from all of the vast majority of states that have abolished sovereign immunity but this would make this opinion entirely too long. We think, however, a quote from a few recent opinions would be helpful. The Supreme Court of New Mexico in Hicks v. State, 88 N.M. 588, 544 P.2d 1153 (1975), quoted the Supreme Court of Illinois in Molitor v. Kaneland Community Unit District No. 302, 18 Ill.2d 11, 21-22, 163 N.E.2d 89, 94 (1959) by stating:
"It is almost incredible that in this modern age of comparative sociological enlightenment, and in a republic, the medieval absolutism supposed to be implicit in the maxim, `the King can do no wrong,' should exempt the various branches of the government from liability for their torts, and that the entire burden of damage resulting from the wrongful acts of the government should be imposed upon the single individual who suffers the injury, rather than distributed among the entire community constituting the government, where it could be borne without hardship upon any individual, and where it justly belongs... ." Likewise, we agree with the Supreme Court of Florida that in preserving the sovereign immunity theory, courts have overlooked the fact that the Revolutionary War was fought to abolish that "divine right of Kings" on which the theory is based. (Citations omitted).
The Supreme Court of Minnesota, in abolishing the doctrine, stated in the case of Nieting v. Blondell, 306 Minn. 122, 235 N.W.2d 597 (1975):
While we are not compelled to follow the example of other courts, we are persuaded by their logic and adopt their conclusion. One of the paramount interests of the members of an organized and civilized society is that they be afforded protection against harm to their persons, properties, and characters. The logical extension of that interest is that, if harm is wrongfully inflicted upon an individual in such a society, he should have an opportunity *1049 to obtain a reasonable and adequate remedy against the wrongdoer, either to undo the harm inflicted or to provide compensation therefor. If the state is properly to serve the public interest, it must strive, through its laws, to achieve the goals of protecting the people and of providing them with adequate remedies for injuries wrongfully inflicted upon them. So long as the state fails to do so, it will be functioning in conflict with the public interest and the public good.
Two of the most recent states to abolish sovereign immunity are Missouri and Pennsylvania. The Supreme Court of Missouri in the case of Jones v. State Highway Commission, 557 S.W.2d 225 (1977), said the following:
We hold that sovereign immunity against tort liability is no longer a bar to such actions and reverse and remand for further proceedings.
This is not the first time we have faced the task of evaluating the argument and scholarship over the continued vitality and validity of the doctrine of sovereign immunity. Experience in the last three decades in other states shows wide support as a matter of public policy for a broad area of governmental tort liability, whether accomplished judicially or legislatively... .
Our duty is to respond to the claims which come before us in a manner consistent with the principles embedded in our constitution, statutes, and judicial precedents. This requires, on rare occasions, as it does today, that we reject the rule of sovereign tort immunity and declare that the government shall be liable for its torts, consistent with the proposition that the government is not in the American system, all powerful. This is in accord with the implicit principles manifested in the whole body of our existing positive law.
The Supreme Court of Pennsylvania in Mayle v. Pennsylvania Department of Highways, 479 Pa. 384, 388 A.2d 709 (1978), said the following:
The question before us is whether the Commonwealth is immune from tort liability except where a legislative act expressly or implicitly authorizes suit. This rule of "sovereign immunity" has been recently upheld by this Court. We today abrogate this doctrine of "sovereign immunity". We conclude that the doctrine is unfair and unsuited to the times and that this Court has power to abolish the doctrine.
Whatever justification ever existed for the doctrine that the Commonwealth is immune from liability for tortious conduct unless the Legislature has consented to suit, the doctrine's day has long since passed. Under the doctrine, plaintiff's opportunity for justice depends, irrationally, not upon the nature of his injury or of the act which caused it, but upon the identity or status of the wrongdoer. Three times in recent years we have repudiated as unfair similar status-based immunities of parties. A majority of the states has rejected sovereign immunity at least to some degree, and commentators oppose it nearly unanimously.
... .
If anything, the information before us suggests that making governments liable for their torts will not substantially raise the costs of government or upset governmental financial stability. Certainly, the greatest threats to the financial stability of state and local governments in recent years have not concerned tort liability, but limitations on taxing authority and liability on contractual obligations such as bonds and labor agreements. Further, because negligence involves the reasonableness of the actor's conduct, unreasonably expensive protective measures will not be required of governments any more than they are required of private parties. Welfare economics analysis suggests that government, if suitable in tort, may become more efficient, although this improvement may not appear on its balance sheets as added assets or reduced liabilities.

*1050 We recently rejected the government-bankruptcy and flood-of-litigation arguments when we abolished local governmental immunity:
"We must also reject the fear of excessive litigation as a justification for the immunity doctrine. Empirically, there is little support for the concern that the courts will be flooded with litigation if the doctrine is abandoned... ."
"[M]ore compelling than an academic debate over the apparent or real increases in the amount of litigation, is the fundamental concept of our judicial system that any such increase should not be determinative or relevant to the availability of a judicial forum for the adjudication of impartial individual rights. `It is the business of the law to remedy wrongs that deserve it, even at the expense of a "flood of litigation"; and it is a pitiful confession of incompetence on the part of any court of justice to deny relief upon the ground that it will give the courts too much work to do.' Prosser, Intentional Infliction of Mental Suffering: A New Tort, 37 Mich.L.Rev. 874 (1939). We obviously do not accept the `too much work to do' rationale. We place the responsibility exactly where it should be: not in denying relief to those who have been injured, but on the judicial machinery of the Commonwealth to fulfill its obligation to make itself available to litigants."
Thus, all the historic arguments made for sovereign immunity either have never been accepted in Pennsylvania or reflect obsolete legal thinking. None has continuing vitality.
The Supreme Court of West Virginia in the case of Long v. City of Weirton, 214 S.E.2d 832 (W. Va. 1975), said:
In an unsophisticated time when demands for governmental services were few and simple of description, perhaps it was correct to say that extinguishing fires, caring for the sick, protecting the citizens in their personal rights and keeping the peace represented the full range of government's mandated responsibilities to its citizens. Perhaps then it was easy to say that any other activity, for example, constructing works of improvement, building roads and streets, supplying water to residences within the municipality and retrieving sewage were completely discretionary with the governmental body. It is obviously not so today.
The Kansas Supreme Court in the case of Brown v. Wichita State University, 217 Kan. 279, 540 P.2d 66 (1975), made the following pronouncement:
The doctrine of governmental immunity is an historical anachronism which manifests an inefficient public policy and works injustice upon everyone concerned. The doctrine and the exceptions thereto, operate in such an illogical manner as to result in serious inequality. Liability is the rule for negligent or tortious conduct, immunity is the exception. But when the tortfeasor is a governmental agency, immunized from liability, the injured person must forego his right to redress unless within a specific exception. Equality is not achieved by artificial exceptions which indiscriminately grant some injured persons recourse in the courts and arbitrarily deny such relief to others... . The operative effects of such arbitrary distinctions are incompatible with the constitutional safeguards established by both the federal and Kansas Constitutions.
* * * * * *
Nor do we find the threat of multiple lawsuits a tenable basis by which the appellants can be denied access to the courts of this state. The threat of "an infinity of actions" is but a monument of shallow reasoning utilized to thwart necessary changes in the law. No individual can match the state's vast resources. Undoubtedly there will be those who shall seek unnecessarily to avail themselves of the access we now provide. That problem, however, can be resolved either by the demands of the law  demands which must be fulfilled before recovery can be secured  or by enactment by the Legislature of an adequate Tort Claims Act. We find it impermissible to deny appellants *1051 access to the courts as a means of forestalling, spurious actions.
* * * * * *
But if due process is to be secured, the law must operate alike upon all and not subject the few to the arbitrary exercise of governmental power. Every citizen of this state has a right to be protected by the government in the enjoyment of his life, liberty and property. To that end elaborate safeguards are to be found in the law. The life and liberty the state may not take directly, it cannot take indirectly for a "grant of power by the public is never to be interpreted as a privilege to injure."
This Court has not hesitated to correct injustices in the legal system. In 1951 in dealing with the abolition of the doctrine of charitable immunity, this Court through Chief Justice McGehee in Mississippi Baptist Hospital v. Holmes, 214 Miss. 906, 55 So.2d 142 (1951), said the following:
In response to what appeared good as a matter of public policy at an early date, many of the courts have created an immunity, which, under all legal theories, is basically unsound, and especially so, when the reasons upon which it was founded no longer exist. Moreover the functions of creating a public policy is primarily one to be exercised by the legislature and not by the courts. It is equally true that when the reason for the existence of a declared public policy no longer obtains, the court should, without hesitation, declare that such policy no longer exists, and especially where the same has been created by the courts instead of by the legislature.
The idea of justice under law was well stated by this Court, none of whose present members were then sitting, in the case of Dr. Pepper Bottling Co. of Miss. v. Bruner, 245 Miss. 276, 148 So.2d 199 (1962), in an opinion by Justice Rodgers where it is stated:
As a general rule, it is the natural inherent duty owed by one person to his fellowmen, in his intercourse with them, to protect life and limb against peril, when it is in his power to reasonably do so. The law imposes upon every person who undertakes the performance of an act  which, it is apparent, if not done carefully, will be dangerous to other persons, or the property of other persons  the duty to exercise his senses and intelligence to avoid injury, and he may be held accountable at law for an injury to person or property which is directly attributable to a breach of such duty.
We could go further and quote the opinions of the vast majority of the states whose language is essentially the same as those hereinabove quoted. We agree that the time has arrived when this Court should recognize that the judiciary is no longer the branch of government to supervise and control the extent to which persons with rightful claims against the sovereign may propound those claims. In fact, in a number of cases we already have said the problem is one our system of government places on the legislative branch. See Berry v. Hinds County, 344 So.2d 146 (Miss. 1977); and Rolph v. Board of Trustees of Forrest County General Hospital, 346 So.2d 377 (Miss. 1977).

SOLUTION OF THE PROBLEM
As already stated, this Court now is committed to the abolition of the judicially created doctrine of sovereign immunity. The question next to be considered is the manner in which this should be accomplished.
We need first to consider the extent to which the decision here applies to those actions by a state agency, an arm of the state or local government and the members thereof, who either for remuneration or as public service, engage in discretionary functions for which the agency or the arm of government was set up. We surely can see that this would be the first question raised by the bench, bar and all laymen. Although absolute governmental immunity from tort liability has lost favor with the courts, there is still considerable support for shielding certain governmental activities from liability. Judicial review of basic policy-making *1052 decisions continues to be regarded by many as inappropriate because courts have no standards by which to judge such decisions. Judges and jurors are in no better position to evaluate the reasonableness of policy determinations than are those officials who are charged with making them. The reasonable man standard of tort law is not an appropriate measure for the political, social or economic desirability of government programs and the methods selected for pursuing them. State tort standards cannot adequately control those government decisions in which, to be effective, the decision maker must look to considerations of public policy and not merely to established professional standards or to standards of general reasonableness.
The imposition of liability on governments for the exercise of legislative, judicial, and executive acts may result in over-cautiousness on the part of the officials who carry out such responsibilities.
With the foregoing problems of everyday governmental functions by individuals, it is our opinion that abolishment of sovereign immunity does not apply to legislative, judicial and executive acts by individuals acting in their official capacity, or to similar situations of individuals acting in similar capacities in local governments, either county or municipal.
The immunity we abolish in this opinion is the immunity of the "sovereign", which broadly speaking is the state, the county, the municipality or any other local subdivision of the sovereign.
We next need to consider the manner and period of time in which the mandate of this opinion shall be carried out. We realize that if it is done immediately, the state and the local subdivisions would not have sufficient time to make preparations therefor. There are many conditions that the legislature may consider. As we already have discussed, we have state agencies which have been ordered and directed by the legislature to carry liability insurance, while others have been refused permission to do so. These are legislative problems that will take time to solve. Other states have recognized this and have abolished the immunity of the sovereign prospectively. Jones v. Highway Commission, 557 S.W.2d 225 (Mo. 1977); O'dell v. School District, 521 S.W.2d 403, 409 (Mo. 1975). We, therefore, are of the opinion that other than in the particular case before us, the mandate of this opinion abolishing sovereign immunity as that term is hereinabove described should not be effective until on and after July 1, 1984. In addition to the time necessary for some entities to adjust, we recognize that two sessions of the legislature will have passed.

CONCLUSION
I. This Court hereby abolishes the doctrine of immunity of the "sovereign." That term includes the state and its local subdivisions. All previous opinions of this Court upholding immunity of the sovereign are hereby overruled. See Appendix "A".
II. We do not abolish by this opinion the historical and well-recognized principle of immunity granted to all legislative, judicial and executive bodies and those public officers who are vested with discretionary authority, which principle of immunity rests upon an entirely different basis, and is left intact by this decision.
III. Proper court procedure requires that we reverse and remand the case sub judice for further proceedings consistent with this opinion as of the date of its mandate. All other claims, demands, actions or causes of action that may accrue as a result of the mandate of this opinion shall apply only to those that accrue on or after July 1, 1984.
REVERSED AND REMANDED.
PATTERSON, C.J., SUGG and WALKER, P. JJ., and BROOM, ROY NOBLE LEE, HAWKINS, DAN M. LEE, and PRATHER, JJ., concur.

APPENDIX A
McKlemurry v. University Medical Center, 380 So.2d 251 (Miss. 1980); Jones v. Knight, 373 So.2d 254 (Miss. 1979); Jagnandan *1053 v. Mississippi State University, 373 So.2d 252 (Miss. 1979), cert. denied 444 U.S. 1026, 100 S.Ct. 690, 62 L.Ed.2d 660 reh'g denied, 448 U.S. 914, 101 S.Ct. 34, 65 L.Ed.2d 1177 (1980); Rolph v. Board of Trustees of Forrest County General Hospital, 346 So.2d 377 (Miss. 1977); and Berry v. Hinds County, 344 So.2d 146 (Miss. 1977), cert. denied, 434 U.S. 831, 98 S.Ct. 114, 54 L.Ed.2d 91 (1977); Horne v. State Building Commission, 233 Miss. 810, 103 So.2d 373 (1958); State v. Sanders, 203 Miss. 475, 35 So.2d 529 (1948); Smith v. Doehler Metal Furniture, 195 Miss. 538, 15 So.2d 421 (1943); State v. Woodruff, 170 Miss. 744, 150 So. 760 (1933); Ayres v. Bd. of Trustees of Leake County Agricultural High School; 134 Miss. 363, 98 So. 847 (1924); Mississippi Livestock Sanitary Bd. v. Williams, 133 Miss. 98, 97 So. 523 (1923); Mississippi Centennial Exposition Co. v. Luderbach, 123 Miss. 828, 86 So. 517 (1920); and J.A.E. Brabham v. Board of Supervisors of Hinds County; 54 Miss. 363 (1877), and others not listed.