Johannes M. **VAN OVOST** and **Freeport Shuttle, Inc.,** Plaintiffs,

v.

**CITY OF ACKERMAN, MISSISSIPPI; Choctaw County, Mississippi; City of Ackerman and Choctaw County Airport Board,** Defendants.

Civ. A. No. EC 91–311–D–D.

United States District Court, N.D. Mississippi, E.D.

Feb. 11, 1993.

eration of defendants' motion and a thorough review of the available statutory and case law which would be applicable to the facts of this case, the court concludes that the motion must be considered as one for summary judgment. Therefore, the parties will be allowed a reasonable opportunity to present material pertinent to a Rule 56 motion. Before discussing the substantive issues of Mississippi law which have guided the court in reaching this conclusion, a review of the procedural posture of the case and the factual basis for the complaint is required.

### A. *Procedural History*

This case comes before the court on the basis of diversity jurisdiction and presents questions which are strictly based on state law. Mr. Johannes M. Van Ovost, a Florida resident, and a pilot for Freeport Shuttle, Inc.,[1] filed suit against the City of Ackerman, Mississippi; Choctaw County, Mississippi; and the City of Ackerman–Choctaw County Airport Board. Although the complaint was filed on November 14, 1991, the defendants did not answer and instead filed a motion to dismiss pursuant to F.R.C.P. 12(b)(6). In the Rule 12(b)(6) motion, the defendants raise the affirmative defense of state sovereign immunity as an absolute bar to suit.

### B. *The Alleged Facts*

James C. Mayo, Louisville, MS, Vincent A. Butler, Wheaton, MD, for plaintiffs.

Joe C. Griffin, Ackerman, MS, for defendants.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

The above styled case is before the court on a motion by the defendants to dismiss the complaint filed by the plaintiffs for failure to state a claim upon which relief may be granted, F.R.C.P. 12(b)(6). Upon careful consid-

On Saturday, July 29, 1989, at approximately 4:30 p.m., Mr. Van Ovost, a transport pilot for Freeport Shuttle, took off on a Visual Flight Rules (VFR) flight from Jackson, Mississippi, to Louisville, Mississippi, in a Piper Seneca I aircraft. In the complaint, Mr. Van Ovost states that he is the owner of the plane and the chief pilot for Freeport Shuttle, Inc.[2] As Mr. Van Ovost approached Louisville, he observed on his airborne radar a line of thundershowers ½ mile southeast of Louisville. The line of thundershowers was running to the northwest and was 3 miles

---

**1.** Freeport Shuttle, Inc. ("Freeport"), is a corporation duly organized in the State of Florida with its principal place of business located in Ft. Pierce, Florida.

**2.** Furthermore, Mr. Van Ovost states that Freeport Shuttle, Inc., is a certified air carrier under part 135 of the Federal Aviation Regulations. Mr. Van Ovost is a certified FAA transport pilot.

Regarding the Ackerman–Choctaw Airport, the plaintiff alleges that the facility is a public use airport, located within the National Air Space System and is listed in the NOAA Southeast U.S. Airport/Facility Directory. Since the airport is subsidized by federal funds, Mr. Van Ovost asserts that it is required to adhere to Federal Aviation Regulations, applicable circulars, and industry standards in its operation.

deep and 30 miles wide. The plaintiff also encountered some turbulence, and he decided to contact the Memphis FAA Center for some guidance. The Memphis FAA Center suggested that the plaintiff avoid Louisville and land at the Ackerman–Choctaw County Airport, which was located 15 miles northwest of Louisville, Mississippi. The plaintiff's complaint states that the Government Airport Facility Directory lists the Ackerman–Choctaw airport as a 3,000 foot long asphalt runway by 75 foot wide with obstructions of record being trees and power lines. When the airport was in sight, Mr. Van Ovost commenced circling maneuvers to determine wind direction for purposes of landing. After completing two circles over the airport, the windsock appeared to indicate that the wind was calm. Hence, Mr. Van Ovost employed a standard entry pattern for landing. Just prior to touchdown, however, the aircraft encountered a strong downwind current. At this point, it was too late to pull up and re-circle. Thus, the plaintiff was forced to touchdown on the runway with full brakes applied immediately thereafter. The aircraft came to a stop approximately 200 feet beyond the runway edge in an area referred to as the "clear zone." This clear zone was allegedly full of potholes and had a one-foot drop which caused damage to the right wing in the area of the gear as well as additional damage to the engines and other areas of the fuselage. Upon closer observation of the airport, Mr. Van Ovost observed that the lower ⅓'s of the windsock was missing, thereby making the windsock totally inoperative.

Mr. Van Ovost asserts two theories for relief in his cause of action. Count I is grounded in negligence. According to the plaintiff, the defendants had a duty to warn all prospective landing aircraft of any conditions which might impair a landing or dangerous conditions which might possibly cause personal injury or property damage. The plaintiff alleges that such a duty could have been partially fulfilled by the filing of a Notice to Airman (NOTAM) with the local FAA Flight Service Station which would have advised all pilots of certain information relevant to a landing at the Ackerman–Choctaw County Airport.[3] Neither the FAA Flight Service Station which covered Jackson, Mississippi, nor the FAA Memphis En Route Center which covered the airport area had been advised of any NOTAMs affecting the Ackerman–Choctaw airport. Hence, the plaintiff alleges injury caused by the failure of the defendants to adequately maintain, clean, and inspect the airport to make the needed corrections and the failure to issue notices to the appropriate agencies to advise of the deficiencies at the airport.

Count II of the complaint is based on a claim of defamation. Regarding the plaintiff's unfortunate July 29, 1989, landing at the airport, Mr. Van Ovost asserts that the defendants maliciously and in reckless disregard for the truth, falsely accused him of drunkenness and other behavior prohibited by a FAA certified pilot. As a result of such acts of defamation, plaintiff alleges that he has been the object of public scorn and ridicule, that his reputation with the FAA has been damaged, and that he has lost future employment opportunities with other aviation companies.

## C. Standard

While the defendants have filed a motion to dismiss pursuant to F.R.C.P. 12(b)(6), they have submitted along with their motion an affidavit which addresses a key area of inquiry. For reasons explained in this opinion, this affidavit addresses an issue which the court must consider in its disposition of this motion. Therefore, pursuant to Rule 12(b)(6), the court is invoking its option to treat the motion as one for summary judgment pursuant to Rule 56 since matters outside the pleading need to be considered by the court.

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed

3. The relevant information would have included that fact that the windsock was inoperative and should not be relied upon, that the runway was old with grass patches, and that the clear zone was full of potholes and had a one-foot drop.

of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

F.R.C.P. 12(b)(6).

The plaintiff is now on notice that the court will properly treat the motion as one for summary judgment since the court accepts for consideration the accompanying affidavit. The consideration of the affidavit gives rise to a duty by this court to provide the plaintiff the procedural safeguards of Rule 56 by allowing a reasonable opportunity to present all material pertinent to a summary judgment motion. *Young v. Biggers,* 938 F.2d 565, 568 (5th Cir.1991); *Washington v. Allstate Ins. Co.,* 901 F.2d 1281, 1284–85 (5th Cir.1990); F.R.C.P. 12(b); Judge Sidney A. Fitzwater, Terry M. Henry, Barbara B. Malin, *Fifth Circuit Summary Judgment Jurisprudence in the District Court,* Fifth Cir.Rep. 350, 364 (Vol. 9, No. 3, January 1992). Consequently, the court will enter an appropriate order following a thorough discussion of the issues which have guided the court in reaching this conclusion.

### D. *Analysis*

As a bar to suit, the defendants raise the defense of sovereign immunity and assert that the doctrine provides a blanket shield from civil liability as alleged in the plaintiff's complaint. Suffice it to say that the doctrine of sovereign immunity has been the "hot topic" in Mississippi jurisprudence in the past six months. Indeed, much has been debated, discussed and proclaimed by both the judicial and legislative branches since August 31, 1992, when the Mississippi Supreme Court decided *Presley v. Mississippi State Highway Commission,* 608 So.2d 1288 (Miss.1992). However, in order to understand the import of *Presley* and the history of the common law and legislative evolution

of sovereign immunity in Mississippi, it is necessary to have a beginning. For our purposes today, that beginning is furnished by *Pruett v. City of Rosedale,* 421 So.2d 1046 (Miss.1982).

In *Pruett,* the Mississippi Supreme Court announced that the day had arrived for Mississippi to join approximately 45 other states in declaring the doctrine of sovereign immunity abolished. *Pruett,* 421 So.2d at 1051. While the court concluded that this ancient axiom of the law[4] was outdated and inefficient for a modern society, the court reasoned that the judiciary was ill-equipped to employ the mechanics of dismantling the doctrine from our law. For this reason, the court in *Pruett* adopted two steps to ease the transition in our law away from the doctrine of sovereign immunity. First, the court "directed" the legislative branch of government to devise a fair and equitable plan for the dismantling of sovereign immunity. The court reasoned that sudden and abrupt loss of complete tort immunity could significantly disrupt "business as usual" for numerous political subdivisions of the state. Furthermore, the court recognized the inequity which already existed throughout the state wherein some state agencies had been ordered by the legislature to procure liability insurance,[5] whereas other state agencies had been refused permission. Since these were considerations which touched and concerned public policy interests, the court determined that the legislature was the appropriate body to dismantle the doctrine from our law. *Pruett,* 421 So.2d at 1052. Second, the court delayed the implementation of *Pruett* until July 1, 1984, after the passage of two legislative sessions in order to provide an adequate period of transition:

> We next need to consider the manner and period of time in which the mandate of this opinion shall be carried out. We real-

---

**4.** The doctrine of sovereign immunity was developed in England many years before this country came of age. The basis of the doctrine is, "the King can do no wrong." *Pruett,* 421 So.2d at 1047.

**5.** Even before *Pruett* was decided in November of 1982, the legislature had authorized a *few* agencies and political subdivisions to carry liability insurance, and immunity of the sovereign was abolished to the extent of the limit of the policy

amount. *Pruett,* 421 So.2d at 1047. However, the court stated in *Pruett* that the slow pace at which the legislature was moving in this direction was a major impetus of judicial abrogation of sovereign immunity. "We would have hoped that this action by this time would have been extended to protect all citizens who might be injured by the sovereign, but this has not been done." *Pruett,* 421 So.2d at 1047.

ize that if it is done immediately, the state and local subdivisions would not have sufficient time to make preparations therefor. There are many conditions that the legislature may consider. As we have already discussed, we have state agencies which have been ordered and directed by the legislature to carry liability insurance, while others have been refused permission to do so. These are legislative problems that will take time to solve.... We, therefore, are of the opinion that other than in the particular case before us, the mandate of this opinion abolishing sovereign immunity as that term is hereinabove described should not be effective until on and after July 1, 1984. In addition to the time necessary for some entities to adjust, we recognize that two sessions of the legislature will have passed.

*Pruett,* 421 So.2d at 1052.

Furthermore, the immunity which *Pruett* abolished was far from absolute. Rather, the court specifically left intact the cloak of immunity which shields certain "governmental" or "discretionary" activities from liability:

Although absolute governmental immunity from tort liability has lost favor with the courts, there is still considerable support for shielding certain governmental activities from liability. Judicial review of basic policy-making decisions continues to be regarded by many as inappropriate because courts have no standards by which to judge such decisions. Judges and jurors are in no better position to evaluate the reasonableness of policy determinations than are those officials who are charged with making them. The reasonable man standard of tort law is not an appropriate measure for the political, social or economic desirability of government programs and the methods selected for pursuing them. State tort standards cannot adequately control those government decisions in which, to be effective, the decision maker

must look to considerations of public policy and not merely to established professional standards or to standards of general reasonableness.

The imposition of liability on governments for the exercise of legislative, judicial, and executive acts may result in overcautiousness on the part of the officials who carry out such responsibilities.

With the foregoing problems of everyday governmental functions by individuals, it is our opinion that abolishment of sovereign immunity does not apply to legislative, judicial and executive acts by individuals acting in their official capacity, or to similar situations of individuals acting in similar capacities in local governments, either county or municipal.

The immunity that we abolish in this opinion is the immunity of the 'sovereign', which broadly speaking is the state, the county, the municipality or any other local subdivision of the sovereign.

*Pruett,* 421 So.2d at 1051–52.

Indeed, the *Pruett* court made it clear that governmental/discretionary functions remained immune from suit. However, even long before *Pruett,* sovereign immunity in Mississippi was not absolute. Municipalities were subject to liability for negligent acts which occurred as a result of the city's proprietary functions. *Burton v. City of Philadelphia,* 595 So.2d 1279, 1280 (Miss.1991); *Ditta v. City of Clinton,* 391 So.2d 627, 629 (Miss.1981); *Nathaniel v. City of Moss Point,* 385 So.2d 599, 601 (Miss.1980); *Tucker v. City of Okolona,* 227 So.2d 475, 476 (Miss.1969); *City of Ruleville v. Grittman,* 250 Miss. 842, 168 So.2d 527, 529 (1964); *City of West Point v. Meadows,* 236 Miss. 394, 110 So.2d 372, 373 (1959); *Bishop v. City of Meridian,* 223 Miss. 703, 79 So.2d 221, 224 (1955). In a limited number of instances, immunity had been waived by statute.[6] Nevertheless, the legislative response to *Pruett v. City of Rosedale,* 421 So.2d 1046 (Miss.

---

**6.** *See, e.g., Miss.Code Ann.* §§ 19–7–8 (Supp. 1992) (boards of supervisors may purchase liability insurance for county vehicles; immunity waived to extent of liability insurance); 43–33–11 (Supp.1992) (housing task force may sue and be sued); 49–1–60 (Supp.1992) (insurance covering hunter safety program conducted by Depart-ment of Wildlife, Fisheries and Parks; affected persons may sue to extent of coverage); 65–1–8(p) (Supp.1992) (Mississippi Transportation Commission may purchase liability insurance for its vehicles; immunity waived to extent of liability coverage).

1982), was not what the court anticipated. Rather than taking steps to abolish sovereign immunity by July 1, 1984, the legislative branch took steps to preserve the immunity that the state and local political subdivisions had long enjoyed.

In 1984, the Legislature responded to *Pruett* by enacting a comprehensive sovereign immunity package. This legislation is commonly referred to as the Sovereign Immunity Act, and it is codified at *Miss.Code Ann.* § 11–46–1 *et seq.* It addresses an array of potential liability situations against the state and its political subdivisions. Although § 11–46–5 purports to waive immunity against the state, the waiver exists only in theory and not in practice. For every year since 1984, the Mississippi Legislature has methodically, and year by year, delayed implementation of § 11–46–5. This provision has never taken effect in our law. The most recent version of § 11–46–5, enacted in the 1992 session, is reproduced below.[7] Additionally, section 11–46–9 lists nineteen exclusions, or exceptions, in which immunity is preserved; and, sections 11–46–7(3), 11–46–15 and 11–46–16 [8] explain that the waiver of immunity applies only if, and to the extent of, liability insurance coverage with section 11–46–15 providing a cap of liability which can not be exceeded.

However, the most notable features of the 1984 Act were codified at § 11–46–3 and 11–46–6. Section 11–46–3 [9] contains a "declaration of legislative intent" which has been re-enacted every year since 1984. Again, the effect of each re-enactment every year since 1984 has been to postpone the implementation of any waiver of immunity contained in the 1984 Act. However, it was § 11–46–6 which caught the attention of the Mississippi Supreme Court in *Presley v. Mississippi State Highway Commission,* 608 So.2d 1288 (Miss.1992).[10] Perhaps out of an abundance of caution or an abundance of fear for the loss of tort immunity, the legislative branch attempted to "freeze" the status of the common law in regards to sovereign immunity as such existed prior to *Pruett v. City of Rosedale,* 421 So.2d 1046 (Miss.1982). The *Presley* decision turned on the content and interpretation of § 11–46–6, and the full text of the 1992 version of the statute is set forth below:

This chapter shall apply only to claims or causes of action arising from acts or omissions occurring on or after July 1, 1993, as to the state, and on or after October 1, 1993, as to political subdivisions. Claims or causes of action arising from acts or omissions occurring prior to July 1, 1993, as to the state, or prior to October 1,

---

7.    (1) Notwithstanding the immunity granted in Section 11–46–3, or the provisions of any other law to the contrary, the immunity of the state and its political subdivisions from claims for money damages arising out of the torts of such governmental entities and the torts of their employees while acting within the course and scope of their employment is hereby waived from and after July 1, 1993, as to the state, and from and after October 1, 1993, as to political subdivisions; provided, however, immunity of a governmental entity in any such case shall be waived only to the extent of the maximum amount of liability provided for in Section 11–46–15.

*Miss.Code Ann.* § 11–46–5(1) (Supp.1992).
    Since 1984, the legislature has delayed implementation by amending this section to postpone to effective date accordingly.

8.  While some version of § 11–46–15 has been a fixture since the original 1984 Act, section 11–46–16 was added anew in 1990.

9.    The Legislature of the State of Mississippi finds and determines as a matter of public policy and does hereby declare that from and after July 1, 1993, the 'state' and, from and

after October 1, 1993, its 'political subdivisions,' as such terms are defined in Section 11–46–1, shall not be liable and shall be immune from suit at law or in equity on account of any wrongful or tortious act or omission, including libel, slander or defamation, by the state or its political subdivisions, or any such act or omission by any employee of the state or its political subdivisions, notwithstanding that any such act or omission constitutes or may be considered as the exercise or failure to exercise any duty, obligation or function of a governmental, proprietary, discretionary or ministerial nature and notwithstanding that such act or omission may or may not arise out of any activity, transaction or service for which any fee, charge, cost or other consideration was received or expected to be received in exchange therefor.
*Miss.Code Ann.* § 11–46–3 (Supp.1992) (Declaration of legislative intent).

10.  *Presley* was decided on August 31, 1992. The petition was rehearing was denied on December 3, 1992.

1993, as to political subdivisions, shall not be affected by this chapter but shall continue to be governed by the case law governing sovereign immunity as it existed immediately prior to the decision in the case of Pruett v. City of Rosedale, 421 So.2d 1046, and by the statutory law governing sovereign immunity in effect from and after the passage of Chapter 474, Laws of 1985.

*Miss.Code Ann.* § 11–46–6 (Supp.1992).[11]

Each year since 1984, the Mississippi Legislature re-enacted § 11–46–6 and simply postponed the appropriate July and October dates to the following year in an effort to delay the implementation of the waiver and to freeze the common law governing sovereign immunity. While there were numerous decisions from 1982 until 1992 wherein the court applied the Sovereign Immunity Act,[12] *Presley v. Mississippi State Highway Commission*, 608 So.2d 1288 (Miss.1992), was the first case which attacked the constitutionality of the Act. *Presley* held that § 11–46–6 was unconstitutional on two fronts. First, the attempt by the legislative branch of government "to tell" the judicial branch to apply case law as it existed prior to *Pruett v. City of Rosedale*, was unconstitutional and void as a violation of the separation of powers article of the Mississippi Constitution of 1890.[13]

If the legislature would prescribe a different rule for the future from that which the courts enforce, it must be done by statute, and cannot be done by a mandate to the courts, which leaves the law unchanged, but seeks to compel the courts to construe and apply it, not according to judicial, but according to the legislative judgment.

*Presley v. Mississippi State Highway Comm'n,* 608 So.2d 1288, 1296 (Miss.1992) (quoting Thomas M. Cooley, 2 *A Treatise on Constitutional Limitations,* at 191 (8th ed. 1927)). Second, § 11–46–6 was also held unconstitutional for the reason that it attempted to revive an entire body of common law by reference only.[14] Such revisions by reference run afoul of Article 4, Section 61 of the Mississippi Constitution.

In addition to the constitutionality question, the court grappled with question of whether to apply the rule of *Presley* retroactively or prospectively. Obviously, retroactivity of the *Presley* decision could potentially impact hundreds of pending or "closed" cases or causes of action, such as the case *sub judice*, which accrued or were decided or litigated following *Pruett v. City of Rosedale,* 421 So.2d 1046 (Miss.1982). Ultimately, the supreme court, in a 4–3 split,[15] opted for prospective application of the holding in *Presley*, with one "exception":

This Court creates a 'new rule' as today's ruling suddenly scraps the continuing,

---

11. The "chapter" which § 11–46–6 refers to in the first line of the statute is chapter 46 of title 11. Chapter 46 is where the 1984 Sovereign Immunity Act and subsequent amendments are codified. *See Miss.Code Ann.* § 11–46–1 *et seq.* Therefore, § 11–46–6 has a key role as it pertains to the entire Sovereign Immunity Act since the statute delays implementation of the Act until certain dates in the future.

12. *Starnes v. City of Vardaman,* 580 So.2d 733 (Miss.1991); *McKay v. Boyd Construction Co., Inc.,* 571 So.2d 916 (Miss.1990); *Employers Ins. of Wausau v. Mississippi State Highway Comm'n,* 575 So.2d 999 (Miss.1990); *Richardson v. Rankin County Sch. Dist.,* 540 So.2d 5 (Miss.1989); *Webb v. County of Lincoln,* 536 So.2d 1356 (Miss. 1988); *Region VII, Mental Health–Mental Retardation Center v. Isaac,* 523 So.2d 1013 (Miss. 1988); *Strait v. Pat Harrison Waterway Dist.,* 523 So.2d 36 (Miss.1988); *Grantham v. Mississippi Dept. of Corrections,* 522 So.2d 219 (Miss.1988); *State v. Lewis,* 498 So.2d 321 (Miss.1986).

13. Miss.Const. art. I, § 1.

14. The constitutional problem with § 11–46–6 was the reference in the statute to the *Pruett* decision without inserting the full text. *Presley,* 608 So.2d at 1297–98.

15. Justices Dan Lee, Robertson, Pittman and Banks voted for prospective application of the *Presley* decision. In a terse dissent which was joined by Justices Hawkins and Sullivan, Justice McRae argued for retroactive application. Chief Justice Roy Noble Lee and Justice Prather dissented from the constitutionality question and would have held the Sovereign Immunity Act constitutional. Since *Presley* was decided in August of 1992, the Chief Justice and Justice Robertson have left the court, and there are now two new members of the state's highest court. In view of these facts, it occurs to this court that the coalition of support for on the prospective/retroactive question is precarious and that the final chapter on this question may not have been written.

temporal extensions of immunity the State of Mississippi and its political subdivisions were granted under Miss.Code Ann. § 11–46–6 ... An essential question before this Court, then, is whether this 'new rule' will apply prospectively (stripping immunity from the date of this decision forward), retroactively (stripping immunity for this action as well as for actions caused prior to the date of this decision) ... We conclude that the first option—pure prospective application of the new rule—is the correct course.

*Presley,* 608 So.2d at 1298–99.

The "exception" to the prospective rule of *Presley* comes into play in instances where a governmental entity has protected itself with the purchase of liability insurance. This exception was recently clarified in *Lee County Board of Supervisors v. Fortune,* 611 So.2d 927 (Miss.1992):

> In *Presley,* we held the legislative reestablishment of sovereign immunity ineffective as violative of the constitutional prohibition against reviving laws by reference. We limited the effect of the statute to 'immunizing the State from claims arising thereafter to the extent that this court would do so applying the evolving standards of common law' and provided that abolition of sovereign immunity there declared is fully retroactive for governmental entities having obtained liability insurance covering the incident in question, to the extent of such insurance. We remanded the *Presley* case for further consideration in light of our holding.

The Mississippi Legislature was quick to respond to the *Presley* decision. Fearing the loss of immunity by *Presley,* Governor Kirk Fordice called a special session of the legislature to formulate a legislative response. First, the legislature repealed § 11–46–6, which the court declared unconstitutional. (H.B. 2, First Extraordinary Session of 1992). However, the Legislature retained the blanket statement of immunity in tort for the state and its political subdivisions, but

exceptions to tort immunity were carved. Municipalities in the performance of proprietary functions were specifically excepted from the grant of immunity,[16] and any governmental entity of the state was authorized to purchase liability insurance to cover wrongful or tortious acts or omissions by the entity or its employees. For any governmental entity purchasing liability insurance, immunity in tort was waived to the extent of its coverage. (H.B. 2, First Extraordinary Session of 1992). The legislation passed in the 1992 Special Session was considered a temporary, emergency measure. This is revealed by the fact that the pertinent provisions addressing tort immunity were to have no force or effect from and after July 1, 1993, as to the state, and from and after October 1, 1993, as to political subdivisions. Consequently, further study and action were anticipated for the 1993 legislative session.

Truly, sovereign immunity in Mississippi is presently a "work in progress," and before one may determine whether or not immunity attaches, a maze of loopholes and potential pitfalls must be successfully negotiated. Nevertheless, this court must be true to its *Erie* [17] duty and apply the law as pronounced by the Mississippi Supreme Court in its recent decisions. As this court understands that task in regard to the defense of sovereign immunity, the court is to apply the statutory and common law as it existed pre-*Presley.* In the case *sub judice,* the task is particularly challenging since the named defendants are a municipality, a county, and a local airport authority, City of Ackerman–Choctaw County Airport Board, which, as a political subdivision of the state, is apparently a city-county "hybrid." As discussed above, the picture is further clouded by the fact that municipalities in the performance of proprietary and ministerial functions have long been subject to a different set of rules which have not been imposed upon other political subdivisions of the state. Furthermore, the distinction between a governmental and proprietary function is not always

---

**16.** This move reflected nothing new. As discussed above, the common law had long recognized liability for municipalities in the performance of proprietary functions.

**17.** *Erie Railroad Company v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); 28 U.S.C. § 1652.

clear, and courts have often struggled with the question:

> Abstract formulae for determining the character of municipal functions have been stated in former decisions, City of Pass Christian v. Fernandez, 100 Miss. 76, 56 So. 329, 39 L.R.A.,N.S., 649 (1911), but the expansion in number and variety of municipal services in recent years renders difficult a determination whether a particular function is governmental or proprietary in character.

*Tucker v. City of Okolona*, 227 So.2d 475, 476 (Miss.1969). The above statement was made by the supreme court in 1969, and certainly the expansion of municipal services since then has blurred the governmental/proprietary distinction even more. Indeed, the "abstract formulae" which was offered in *Pass Christian* case of 1911 offers very little help, if any, when applied to modern living of present times:

> The public or governmental duties of a city are those given by the state to the city as a part of the state's sovereignty, to be exercised by the city for the benefit of the whole public, living both in and out of the corporate limits. All else is private or corporate duty, and for any negligence on the part of the agents or employes (sic) of the municipality in the discharge of any of the private duties of the city the city is liable for all damage just as an individual would be.

*City of Pass Christian v. Fernandez*, 100 Miss. 76, 56 So. 329 (1911).

The maintenance of a street bumper, a stop sign, an overhead traffic light, the hauling of dirt and trash, and the repair of city streets have all been held proprietary functions. *White v. Thomason*, 310 So.2d 914 (Miss.1975); *Wall v. City of Gulfport*, 252 So.2d 891 (Miss.1971); *Tucker v. City of Okolona*, 227 So.2d 475 (Miss.1969); *City of West Point v. Meadows*, 236 Miss. 394, 110 So.2d 372 (1959); *Warren v. Town of Booneville*, 151 Miss. 457, 118 So. 290 (1928). However, the decision of whether or not to place a traffic light at an intersection has been held a governmental function, especially in the absence of an ordinance requiring the city to maintain traffic devices at intersections.

*Wall v. City of Gulfport*, 252 So.2d 891 (Miss. 1971). "[T]here is a marked distinction between maintaining an overhead traffic light and the replacement of one that has been completely removed." *Wall*, 252 So.2d at 893.

Without question, Mr. Van Ovost would argue that an inoperable windsock and a pothole riddled "clear zone" beyond the runway are akin to a broken traffic light and a city street in a state of disrepair, all of which have been held proprietary functions. To this end, the plaintiff asserts in his complaint that the Ackerman–Choctaw Airport is bound with a duty to maintain certain standards imposed by Federal Aviation Regulations and acceptable industry standards in the operation of a general aviation airport. If this were all that the court had to consider, the task might be somewhat simpler. Instead, the Mississippi Legislature has determined as a matter of law that the maintenance and operation of an airport by a municipality in the exercise of other powers granted to an airport board are public and governmental functions performed as a matter of public necessity. Miss.Code Ann. § 61–5–47 "decrees" the governmental character of such activities and extends a grant of immunity for municipalities and their agents:

**§ 61–5–47. Declaration of public purpose and necessity; non-liability for torts.**

[Until October 1, 1993, Section 61–5–47 shall read as follows:]

The acquisition of any lands for the purpose of establishing airports or other air navigation facilities, the acquisition of any airport protection privileges, the acquisition, establishment, construction, enlargement, improvements, *maintenance, equipment and operation of airports and other air navigation facilities by any municipality or municipalities of this state, separately or jointly, and the exercise of any other powers granted in the Municipal Airport Law to any airport board, joint board or authority are hereby declared to be public and governmental functions, exercised for a public purpose, and matters of public necessity.* Such lands and other property and privileges acquired and used by the municipality in the manner and for

the purposes enumerated in said law shall and are hereby declared to be acquired and used for public and governmental purposes and as a matter of public necessity.

*No action or suit in tort shall be brought or maintained against the state or any municipality thereof, or the officers, agents, servants or employees of the state or any municipality thereof,* on account of any act done in or about the construction, *maintenance,* enlargement, *operation,* superintendence or management *of any airport* or other air navigation facility.

*Miss.Code Ann.* § 61–5–47 (Supp.1992).[18]

Notwithstanding § 61–5–47 which shields municipalities that enter the airport business, the plaintiff invites the court's attention to § 61–3–15 which allows suit against an airport authority, if, and to the extent, of liability coverage.

### § 61–3–15. General powers of authorities.

[Until October 1, 1993, Section 61–3–15 shall read as follows:]

An authority shall have all the powers necessary or convenient to carry out the purposes of this chapter (excluding the power to levy and collect taxes or special assessments) including, but not limited to, the power:

(a) *To sue and be sued,* to have a seal and to have perpetual succession.

(b) To purchase general liability insurance coverage, including errors and omissions insurance, for the authority, its officials and employees. *If the authority has liability insurance coverage, the authority may be sued by anyone affected to the extent of such insurance carried;* however, immunity from suit is only waived to the extent of such liability insurance carried and any recovery in such action shall be limited solely to the proceeds of any such liability insurance coverage and a judg-

ment creditor shall have recourse only to the proceeds of such liability insurance coverage. Any judgment rendered in excess of the limits of such insurance shall, on motion of the court, be reduced to the authority to the amount of the liability insurance coverage but not as to any joint tort-feasor, if any. No attempt shall be made in the trial of any case to suggest the existence of any insurance which covers in whole or in part any judgment that may be rendered against any authority.

*Miss.Code Ann.* § 61–3–15 (Supp.1992).[19]

Section 61–3–15 makes the existence, or not, of liability insurance by the Ackerman–Choctaw Airport Board a key inquiry into their potential for any liability in tort. In this regard, the court can only be guided at this stage by the affidavit which was submitted along with the defendants' motion to dismiss. The affidavit is submitted by Mr. Joe C. Griffin, the attorney for the City of Ackerman and the Choctaw County Board of Supervisors. According to Mr. Griffin, he has been so employed in both positions for the past five years, and he affirms that neither the City of Ackerman, Choctaw County, nor the Ackerman–Choctaw Airport Board have, nor have they ever had, liability insurance that would cover the claims set forth by the plaintiff.

2. I am the attorney for the Board of Supervisors in and for Choctaw County, Mississippi; and attorney for the Board of Alderman in and for the Town of Ackerman, Mississippi, and have been so employed for five (5) years and more.

3. I hereby affirm that the City of Ackerman, Mississippi; Choctaw County, Mississippi; and, City of Ackerman and Choctaw County Airport Board do not now nor have they ever had liability insurance in force and effect that would cover the claims set

---

**18.** As the introduction to § 61–5–47 suggests, this statute is to be amended as of October 1, 1993, unless the current session of the legislature delays the implementation for yet another year. The amended version drops the second paragraph of the statute. However, the declaration of governmental function is the focus of interest, and the court applies the law which was in force in July of 1989 when the plaintiff's cause of action arose. Furthermore, this statute has been

repeatedly re-enacted in the same chapter and package of legislation as §§ 11–46–3 and 11–46–6, discussed above, and other statutes, wherein the legislature has delayed, year by year, the implementation of certain losses of immunity.

**19.** *But see Miss.Code Ann.* § 61–3–83, wherein the legislature appears to insulate airport authorities from liability.

forth by Plaintiff in the above styled and numbered cause.

In addition to the importance of liability coverage in regards to § 61-3-15's applicability to the local airport authority, *Presley* and *Fortune* instruct, as discussed herein, that the existence of liability coverage would create an exception to *Presley*'s rule of prospective application to other political subdivisions of the state (e.g., the county). *Lee County Bd. of Supervisors v. Fortune,* 611 So.2d 927 (Miss.1992); *Presley v. Mississippi State Highway Comm'n,* 608 So.2d 1288, 1301 (Miss.1992). Hence, it would be improvident for the court to issue a definitive ruling on the bare motion to dismiss pursuant to Rule 12(b)(6). The court must go outside the pleading to consider the contents of the affidavit and allow a reasonable opportunity for all parties to respond. To this end, the court will enter an appropriate order to set forth the necessary mechanics to enable it to consider the motion to dismiss as one for summary judgment in accordance with the standards of a Rule 56 motion.

### ORDER CONVERTING RULE 12(b)(6) MOTION TO MOTION FOR SUMMARY JUDGMENT

1. In accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court accepts for consideration the affidavit submitted on behalf of the Defendants. Consequently, the Court will treat the Motion to Dismiss as one for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

2. To give Plaintiffs adequate notice and an opportunity to show that there is a genuine issue and that all Defendants are not entitled to judgment as a matter of law on the defense of tort immunity, the Court hereby allows Plaintiff 30 days from the date of entry of this Order to submit any evidence on the existence of liability insurance by the Defendants which would show why summary judgment is not appropriate. Defendants will then have 15 days to respond with whatever materials or documents they wish to submit.

3. The Order heretofore entered on January 21, 1992 staying discovery is hereby lifted. The Defendants shall respond to Plaintiff's discovery request within 15 days of the date of this Order. Further, the parties are hereby granted 20 days from the date of this Order to schedule pertinent and/or appropriate depositions.

IT IS SO ORDERED.